[No. A132610. First Dist., Div. Two. Mar. 28, 2012.]

In re CHRISTOPHER MORGANTI on Habeas Corpus.

## COUNSEL

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Anya M. Binsacca and Amber N. Wipfler, Deputy Attorneys General, for Appellant The People.

Michael Satris, under appointment by the Court of Appeal, for Petitioner Christopher Morganti.

## OPINION

**RICHMAN, J.**—The People appeal from an order granting Christopher Morganti's petition for a writ of habeas corpus and directing the Board of Parole Hearings (the Board) to hold a new hearing to determine whether to fix a release date for Morganti. Like the trial court, we conclude that, even applying the ultralenient "some evidence" standard, the Board's decision that Morganti is unsuitable for parole cannot be upheld. Accordingly, we affirm the superior court's decision granting habeas corpus relief.

### FACTS AND PROCEEDINGS BELOW

*Preconviction History*

Morganti was born in Healdsburg in 1951 into an intact and religious Italian-American family. He suffered no abuse or neglect or other trauma as a

child, and has no history of juvenile convictions. He attended parochial schools until he graduated from high school in 1970, when he enrolled in Santa Rosa Junior College. He dropped out of junior college before the end of his first year and obtained employment as a carpenter. During the next five years, while working as a carpenter, he drank beer and smoked marijuana regularly. He gradually became addicted to cocaine, by the late 1970's was "shooting" cocaine intravenously, and in order to support this habit began selling it.

In 1977 Morganti moved to the State of Washington, where he obtained a contractor's license and started his own construction company. He got married and had a child, and also adopted his wife's son. After five years he and his wife divorced, and in 1987 Morganti moved back to Sonoma County to care for his father, who had cancer. During the two years he cared for his father, Morganti's drug use escalated, and at one point he was injecting or ingesting as much as an ounce of cocaine daily. Following his father's death, Morganti remarried. The commitment offense took place six weeks later, on November 16, 1991.

*The Commitment Offense*

Morganti and Ron Turner, an employee of the Le Grande Motel in Cloverdale, were both "heavily involved in drugs." Morganti supplied Turner with cocaine in return for the free use of motel rooms. In order to hide the transaction from the owner of the motel, Morganti would give Turner his credit card on the understanding Turner would later "pull" the charge slips before they were processed by the credit card company. When Turner failed to do this on one occasion, Morganti received a credit card bill for $763. After receiving several more such bills—and at a time at which he "had been high every day, up three or four days[,] and then sleep and then up again"—Morganti confronted Turner in his room at the motel. In a rage, he stabbed Turner 26 times with a knife he had brought with him. He then set fire to the room and fled. He was arrested three days later. In June 1993 a jury found Morganti guilty of second degree murder and arson of an inhabited structure, and he was sentenced to state prison for 21 years to life. These are the only violent crimes Morganti has committed.[1]

---

[1] Morganti had three prior convictions: in 1976 he was convicted of reckless driving (Veh. Code, § 23103) and carrying a concealed weapon (Pen. Code, former § 12025), for which he received "3 months summary probation," and in 1991 he was convicted of reckless driving while eluding a peace officer (Veh. Code, § 2800.2), for which he served 10 days in county jail on a conditional sentence of three years in state prison.

*Postconviction History*

As noted in the most recent psychological evaluation, Morganti "has functioned without behavioral problems" for almost 20 years, "worked consistently and regularly" while in prison, most recently as the lead man in the butcher shop. "He generally receives above average to superior evaluations for both relationships and performance." He has also worked on the waste control crew and earned a certificate qualifying him as a lift truck operator. He has applied for a computer repair program but has remained on the waiting list for more than three years. He has consistently participated for many years in Alcoholics Anonymous (AA), Narcotics Anonymous (NA), Overcomers Outreach (a faith-based 12-step program), and numerous other rehabilitative programs, including classes in stress and anger management. However, his desire to participate in such programs has been frustrated by the elimination of some of them and cutbacks in others, due to reductions in the budget of California's Department of Corrections and Rehabilitation (CDCR).

When Morganti first arrived in prison he "had a few friends in the biker group" whom he met "through my first cellie"; those relationships ended years ago, when he returned to the Catholic faith and became actively involved in church-sponsored programs. Though he previously spent a great deal of his free time engaging in physical activities and exercise, these activities have been "severely limited" by serious medical problems: he has been diagnosed with heart disease, emphysema, hyperlipidemia, hepatitis C, chronic viral illness, and cardiac arrhythmia, and in 2007 he underwent cardiac bypass surgery. He now uses his free time to "walk a few laps with an old friend and we play dominoes and cribbage. I watch the educational videos and we have Bible studies and classes through the church."

Morganti has plans in the event he is released on parole. He owns his own house, has numerous physically undemanding job offers, was left money by his mother, and, as indicated by numerous letters sent to the Board in his behalf, has a significant amount of support from family members, former neighbors, classmates, teachers, and others in the Healdsburg community with whom he corresponds, several of whom have offered him employment in the event his "medical issues" allow it. The Board also received a letter from a friend who stated her willingness to transport Morganti to and from support group meetings, such as AA and NA, if he needed such assistance.

*Psychological Evaluation*

On March 24, 2010, shortly before Morganti's most recent parole hearing, Dr. Michael Pritchard submitted a 14-page comprehensive risk assessment to the Board. Dr. Pritchard stated that Morganti has made a "commitment to

abstinence from intoxicating substances," and participated in AA and NA even though "he believes they are not essential to his sobriety," and "intends to rely on the support of his church as well as attending NA meetings if he returns to the community." Because "sobriety in a highly controlled and structured milieu such as prison does not necessarily generalize to the free community," Dr. Pritchard opined that the "risk of relapse" might be mitigated "by ongoing participation in NA or AA meetings, adherence to said organizations' guiding principles and/or the maintenance of an AA or NA sponsor in the free community, in addition to having a well-defined relapse prevention plan."

When asked by Dr. Pritchard to assess himself, Morganti wrote: "I am a good person. I believe in my religion and my family. I believe in my country. I believe in right and wrong. I've always made my own way. I took care of myself. Sometimes I let my work overrun my relationships. I have to stay grounded in my church, in my faith. [¶] The peer pressure I used to feel, even into my 40s, I don't care about that any more. I have learned to involve myself with people through my church. I have changed. It is drug use versus religion. I am more secure in myself now. I don't have to have a lot of friends. I know who I am and what I am. I am a Catholic, an Italian, an American, a pop, and a grandpa; at least I want to be a grandpa if I get a chance." Dr. Pritchard commended Morganti for speaking "openly and directly," and observed that his statements are "not inaccurate, although perhaps self-serving." He also felt Morganti's revelations about his past use of controlled substances were "a product of thoughtful reflection on his history of substance abuse."

In assessing the risk of violence presented by Morganti's release on parole, Dr. Pritchard utilized "a combination of actuarially-derived and structured professional judgment approaches," specifically the "Psychopathy Check List-Revised" (PCL-R) approach and that prescribed by the "Historical-Clinical-Risk Management-20" (HCR-20). Additionally, for assessment of the general risk for criminal recidivism, Dr. Pritchard employed the "Level of Service/Case Management Inventory" (LS/CMI) protocol. According to him, "[t]hese measures are widely used and are supported by years of research in the risk assessment field. They have been cross-validated with various forensic populations, including United States males in correctional settings. They are scored on the basis of semi-structured interview and information obtained from the record. Estimates of risk [are] presented categorically: Low, Moderate/Medium, or High as compared to the general offender population."

Dr. Pritchard stated that under the PCL-R Morganti "obtained a total score . . . which placed him in the _Low_ Range of Psychopathy when

compared to other North American offenders at approximately the 5th percentile." Morganti's overall score as measured by the "HCR-20 was [also] in the *Low* Range of violent recidivism," as was his LS/CMI score, which indicated that "he is at the *Low* Risk/Need Level for recidivism of any kind at approximately the 5th percentile in the population of U.S. male offenses."

Dr. Pritchard's overall assessment of Morganti was that "Mr. Morganti presents a *LOW RISK* for violence in the free community. For all the antisocial behavior demonstrated by his cocaine addiction and penchant for the 'biker philosophy,' his record reflects no violence or crimes outside of the life crime. He has functioned responsibly and compliantly while incarcerated. He is currently 59 years old and in relatively poor health. Despite his cavalier attitude about his personal potential for substance use relapse, he nevertheless presents as an overall low risk to reoffend."

*The 2010 Parole Hearing and Decision*

During the course of the four-hour hearing that took place on August 2, 2010, the two members of the Board panel briefly acknowledged that Morganti had received positive psychological evaluations;[2] that his discipline-free conduct in prison was exemplary; and that his parole plans were realistic, as shown by the job offers and other support expressed by many present and former residents of Healdsburg, where he planned to live if released.

Nevertheless, after taking a recess and deliberating, the presiding commissioner announced that Morganti had been found unsuitable for parole, and "[i]t's a three-year denial" (Pen. Code, § 3041.5, subd. (b)(3), with subsequent statutory references are to the Pen. Code unless otherwise indicated.).

---

[2] Based on materials lodged in this court in connection with the petition, the Board was apparently referring not just to Dr. Pritchard's evaluation, but also those of the two psychologists who separately evaluated Morganti in 2006 in connection with his first parole hearing that year: Dr. Laura Petracek and Dr. Melvin Macomber. Dr. Petracek felt Morganti was sincerely remorseful for his crime, noted his disciplinary free behavior, and found his past drug use "no longer relevant to a diagnosis of current dangerousness." With respect to Morganti's dangerousness, she opined that "[i]f released into the community, he is considered a low risk of re-offending. He is more than likely to maintain his gains if released. He has demonstrated no propensity to violence within the prison setting to date and is unlikely to do so if released into the community."

Dr. Macomber agreed. Stating that Morganti "does not have any mental or emotional problems," he assessed Morganti's then present dangerousness as follows: "[I]nmate Morganti is an older gentleman who is in poor health. He does not pose any risk at all to society. The Level of Service Inventory-Revised was administered. This is an actuarial measure that assesses criminal history, substance abuse history, social relations, and other factors to determine current risk level on parole. He obtained a score of 1.8 cumulative frequency for prison inmates. This means that if 100 inmates were released on parole, he would do better on parole than 98 percent of them."

Summing up the reasons for this determination, the presiding commissioner stated as follows:[3] "You've done some good things, but I've got to tell you the overlying issues for us were your substance abuse issues, and whether that makes you a current unreasonable risk of dangerousness in society is because it was so involved in the life crime. . . . [W]e did talk a little bit about if you had any kind of understanding of the life crime, and we did talk about how substance abuse was involved in the life crime, which kind of draws the nexus between the life crime and your substance abuse. I get very nervous and uncomfortable when someone tells me they're going to base a lot of their reasons for staying off drugs on their religion, especially when they had a situation like you went to parochial school or Catholic school. Because it didn't work then. You had a crisis of faith according to what you told us. And so, that concerned us. So, that gave us a reason for, wow, that's probably not going to be so successful. So, then we looked at your substance abuse, relapse prevention plan. I thought your relapse prevention plan was okay [but] . . . I think you need more understanding into your substance abuse. I think you need to get more involved in your AA and NA programs." Noting that Morganti had many "positives" in his record, the presiding commissioner closed his comments with the advice to "[g]et more involved in your self-help. That's our recommendation to you."

Pursuing this subject, the deputy commissioner acknowledged Morganti had taken many self-help programs in addition to AA and NA, but questioned their efficacy, stating that many were conducted "by video conference, or correspondence classes" or were of short duration. During the hearing, after Morganti had described the self-help, therapy, and vocational programs he was taking or had taken, the deputy commissioner inquired about the length of the programs, the frequency of their meetings, and the opportunity they afforded for class discussions. Morganti told her that one course, Cage Your Rage, lasted eight weeks, that other courses in anger control and stress management were each three-week courses, and that a "faith-based self-improvement course" met once a week for between four and six weeks. Morganti also stated that because of "things with the budget," the AA and NA programs were then meeting only once a month, and the stress management class used some "distance learning classes" in which class discussions were not possible.

The deputy commissioner appears to have concluded that the programs Morganti was participating in were insufficiently "comprehensive," observing that "a comprehensive relapse prevention plan would definitely speak to

---

[3] The Board is required to "separately *state* reasons for its decision to grant or deny parole" (§ 3041, subd. (e)(3), italics added), and that "[a]t any hearing, the presiding hearing officer shall *state* his or her findings and supporting reasons on the record." (§ 3042, subd. (c), italics added.)

frequency of meetings, and where they're located, and what have you." Acknowledging that her concern "is perhaps a catch-22," because "the programs and what have you have been curtailed" due to budget cuts, the deputy commissioner advised Morganti that "the older we get, the longer learning new habits takes. And so I would encourage you to continue taking classes. We both understand that programs and what have you have been curtailed, and so take whatever you can."

*The Habeas Corpus Proceedings in the Superior Court*

On January 3, 2011, Morganti filed a petition for habeas corpus in the Sonoma County Superior Court arguing first, and fundamentally, that "the Board's decision to deny Morganti parole lacked any supporting evidence and was otherwise arbitrary in violation of federal and state guaranties to due process of law." Following an order to show cause, the warden filed a lengthy return, and petitioner a response. On June 6, 2011, the trial court (Honorable Virginia Marcoida) filed a detailed and thoughtful nine-page order granting the petition, concluding that the "Board's finding of lack of insight is not supported by some evidence."

Finding the Board's determination that Morganti "lack[ed] insight into his drug use and addiction" was based on its "conclusion that (1) petitioner did not believe programs such as A.A. and N.A. are essential to his recovery, and (2) petitioner did not fully understand the causative factors of his substance abuse," the court found that "[n]one of these findings are supported by the record." Rejecting the Board's conclusion that Morganti was "relying solely on his religion to stay away from drugs" as a "distortion and oversimplification of [his] statements," the court stated that there was "no evidence that he lacks insight into the substance abuse that led him to commit murder." Citing portions of his testimony at the parole hearing, the court pointed out that Morganti "acknowledges that his recovery consists of a combination of things, including his religious beliefs and programs such as A.A. and N.A. He affirmed that he intends to participate in A.A. and N.A. upon his release. The mere fact that petitioner may believe that, for him, the most important aspect of his recovery is his faith in religion does not mean that he is discounting or disregarding the importance of A.A. and N.A. programs as an integral part of the recovery process." The court also noted that Morganti "affirmed that the 12-step program is part of his daily life," and that the "detailed relapse prevention plan" he presented to the Board "included participation in 12-step programs."

The court found that the Board's determination that Morganti "needs to 'go into some more understanding of the motivation of why you turned to drugs' " also was unsupported by some evidence. As the court explained,

Morganti "did not simply blame his past drug use on the crowd he was hanging around with. Rather, petitioner acknowledged there were multiple reasons for his addiction to cocaine. He acknowledged that he enjoyed the high and the rush. He acknowledged that he enjoyed the fast lifestyle that bikers, women, and his friends brought into his life. He has taken full responsibility for his drug use, and has fully acknowledged that he can never have as much as one drink again, as the drug use and the alcohol use are interconnected. While it is undoubtedly true that we can all gain *better* insight into our actions, petitioner's insight into the motivations of why he turned to drugs is more than adequate and does not show a lack of insight into his drug abuse."

Then, noting that since 1994 Morganti "has dedicated himself to leading a sober and drug free life," "participated in all the A.A. and N.A. programs that are available to him in prison" and "also participated in church-based 12-step programs," the court stated that he "has an exemplary history of rehabilitation and reform in prison; and all evidence points toward continued rehabilitation once released." "In sum," the court concluded, "the record provides no rational basis upon which to conclude petitioner is blind to the problem presented by his past drug abuse or has refused to confront the problem, nor reason to believe petitioner is likely to resume abusing substances after more than 16 years of sobriety and active participation in A.A. and N.A. There is no evidence that petitioner will return to drug or alcohol abuse if released on parole. Petitioner's resolve to put into practice the teachings of A.A. and N.A. and remain drug and alcohol free during periods of time where A.A. and N.A. programs were not available to him in prison provides additional evidence of petitioner's ability to maintain his gains upon release."

The court granted Morganti's petition and remanded the matter to the Board to conduct a new parole hearing.[4] (See *In re Prather* (2010) 50 Cal.4th 238, 244 [112 Cal.Rptr.3d 291, 234 P.3d 541] (*Prather*).)

[4] In light of the fact that the court ordered a new parole hearing, it denied as moot Morganti's claim that the Victim's Bill of Rights Act of 2008, known as "Marsy's Law," which amended section 3041.5 by extending the periods of time within which the Board might schedule a new hearing after the denial of parole, violates state and federal ex post facto protections. Because we affirm the judgment, we too have no need to decide this issue, which is currently before the Supreme Court. (*In re Aragon* (2011) 196 Cal.App.4th 483 [126 Cal.Rptr.3d 286], review granted Sept. 14, 2011, S194673; *In re Vicks* (2011) 195 Cal.App.4th 475 [125 Cal.Rptr.3d 627], review granted July 20, 2011, S194129; *In re Russo* (2011) 194 Cal.App.4th 144 [124 Cal.Rptr.3d 444], review granted July 20, 2011, S193197.)

The court also rejected Morganti's claim that the Board "systematically and arbitrarily denies parole to all parties at or near their MEPD (minimum eligible parole date), and thus is disregarding the statutory framework that makes parole the norm and denial of parole the exception," determining that this claim "is conclusory and fails to state a prima facie claim for relief." Morganti renews this argument here. (See Code Civ. Proc., § 906.) We also decline to address this issue, as we consider it moot. We also agree with the trial court that the claim is

Respondent Randy Grounds, warden of the Soledad correctional facility where Morganti is confined, filed timely notice of this appeal on June 7, 2011,[5] and the order he challenges is appealable. (§ 1506.)

## DISCUSSION

### *The Law and the Standard of Review*

We very recently collected and confirmed the applicable rules that govern here, in *In re Young* (2012) 204 Cal.App.4th 288.

*In re Shaputis* (2011) 53 Cal.4th 192 [134 Cal.Rptr.3d 86, 265 P.3d 253] (*Shaputis II*) "is the most recent of several opinions by our Supreme Court that together explain the framework that exists among our three branches of government regarding parole decisions. (See *Prather, supra*, 50 Cal.4th 238; *In re Lawrence* (2008) 44 Cal.4th 1181 [82 Cal.Rptr.3d 169, 190 P.3d 535] (*Lawrence*); *In re Shaputis* (2008) 44 Cal.4th 1241 [82 Cal.Rptr.3d 213, 190 P.3d 573] (*Shaputis I*); *In re Dannenberg* (2005) 34 Cal.4th 1061 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*); *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*).) As they explain, the Board's parole authority is governed by a body of statutes and regulations as mandated by the Legislature, most notably Penal Code section 3041 (section 3041) and title 15, section 2402 of the California Code of Regulations. [Fn. omitted.] (*Shaputis II*, at p. 209, fn. 5; *Prather*, at pp. 249–251; *Lawrence*, at pp. 1201–1203.) [Fn. omitted.]

"Section 3041 mandates that the Board ' " 'normally' " ' set a parole date for an eligible inmate, and ' "must" ' do so unless it determines that an inmate poses a current threat to public safety. (*Prather, supra*, 50 Cal.4th at p. 249, quoting *Lawrence, supra*, 44 Cal.4th at p. 1202.) [Fn. omitted.] As a result, parole applicants have a 'due process liberty interest in parole' and ' "an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and by regulation." ' (*Lawrence, supra*, 44

conclusory, and not adequately developed, and that petitioner fails to identify an appropriate remedy in the event he could establish a right to relief.

[5] Shortly after the notice of appeal, the warden asked the superior court to stay its June 6 order granting the petition for habeas corpus pending resolution of this appeal. That request was granted on August 11, 2011. On August 18, 2011, Morganti moved in this court for an order lifting the stay ordered by the superior court. In denying that request on October 17, 2011, we explained that Morganti's request "is not properly raised by motion, as there is no authority in the Penal Code or elsewhere for such a motion." Treating the motion instead as a petition for writ of mandate, we denied it because Morganti failed to show that the superior court had abused its discretion in granting the stay.

Cal.4th at pp. 1191, 1204.) In other words, ' "parole is the rule, rather than the exception" ' (*id.* at p. 1204, quoting *In re Smith* (2003) 114 Cal.App.4th 343, 366 [7 Cal.Rptr.3d 655]), and 'the onus [is] on the Board to justify denial of parole . . .' (*Shaputis II, supra,* 53 Cal.4th at p. 222 (conc. opn. of Liu, J.)).

■ "Accordingly, as we have discussed, the Board must determine, consistent with due process, the 'essential question' of 'whether the inmate currently poses a threat to public safety.' (*Shaputis II, supra,* 53 Cal.4th at pp. 209, 220.) The Board answers this question by conducting 'an individualized inquiry' into the inmate's suitability for parole (*id.* at p. 219), 'draw-[ing] . . . answers from the *entire* record, including the facts of the offense, the inmate's progress during incarceration, and the insight he or she has achieved into past behavior.' (*Id.* at p. 221, italics added.) It is required to give due consideration to the criteria referred to in section 3041 and, more specifically, in [California Code of] Regulations, [title 15,] section 2402, promulgated by the Board pursuant to legislative mandate. [Fn. omitted.] (*Prather, supra,* 50 Cal.4th at p. 251 [Board '*must* consider the statutory factors concerning parole suitability set forth in section 3041 as well as the Board regulations' (italics added)].)

"[California Code of] Regulations[, title 15,] section 2402 contains numerous factors regarding both an inmate's unsuitability [fn. omitted] and suitability [fn. omitted] for parole that the Board must consider and rely on to assess whether the inmate poses 'an unreasonable risk of danger to society if released from prison.' ([Cal. Code] Regs., [tit. 15,] § 2402, subds. (a), (c), (d).) These 'matrix of factors . . . contemplates that even those who committed aggravated murder may be paroled after serving a sufficiently long term if the Board determines that evidence of post-conviction rehabilitation indicates they no longer pose a threat to public safety.' (*Lawrence, supra,* 44 Cal.4th at p. 1211.)

"We review the Board's decision under a 'highly deferential "some evidence" standard.' (*Shaputis II, supra,* 53 Cal.4th at p. 221.) [Fn. omitted.] The *Shaputis II* opinion states that the Board's decision 'is upheld unless it is arbitrary or procedurally flawed.' (53 Cal.4th at p. 221.) It does not specifically define what is meant by 'procedurally flawed.' Elsewhere, however, it states that '[u]nder the "some evidence" standard of review, the parole authority's interpretation of the evidence must be upheld if it is reasonable, in the sense that it is not arbitrary, and reflects due consideration of the relevant factors.' (*Id.* at p. 212.) [Fn. omitted.]

"More specifically, although ' "[t]he precise manner in which the specified factors relevant to parole suitability are considered and balanced" ' lies with

the Board (*Shaputis II, supra*, 53 Cal.4th at p. 210, quoting *Rosenkrantz, supra*, 29 Cal.4th at p. 677), its decision ' "*must reflect an individualized consideration of the specified criteria* . . . ." ' (*Lawrence, supra*, 44 Cal.4th at p. 1232, quoting *Rosenkrantz*, at p. 677, italics added.) [Fn. omitted.] 'It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; *the significant circumstance is how those factors interrelate* to support a conclusion of *current* dangerousness to the public.' (*Lawrence*, at p. 1212, italics added.) The Board 'must determine whether a particular fact is probative of the central issue of current dangerousness when considered in light of the *full* record.' (*Prather, supra*, 50 Cal.4th at p. 255, italics added.)

" ' "As long as the . . . decision reflects due consideration of the specified factors as applied to the individual prisoner in accordance with applicable legal standards, the court's review is limited to ascertaining whether there is some evidence in the record that supports the . . . decision." ' (*Shaputis II, supra*, 53 Cal.4th at p. 210, quoting *Rosenkrantz, supra*, 29 Cal.4th at p. 677.) We are to ensure that the Board's 'analysis of the public safety risk entailed in a grant of parole is based on a modicum of evidence, not mere guesswork.' (*Shaputis II*, at p. 219.) We review not only the evidence specified by the Board, but the entire record to determine whether this modicum of evidence exists, [fn. omitted] and look for 'a rational nexus between the evidence and the ultimate determination of current dangerousness.' (*Shaputis II*, at p. 221.) We do not reweigh the evidence. (*Ibid.*)

■ "Thus, *Shaputis II* and the Supreme Court opinions upon which it relies make clear that we are to review the Board's decision to ensure that it satisfies two due process imperatives that are particularly relevant to this case. We must determine whether the Board's decision reflects due consideration of all relevant statutory factors and, if it does, whether its analysis is supported by a modicum of evidence in the record, not mere guesswork, that is rationally indicative of current dangerousness.

"If the Board's consideration of the specified factors is not supported by some evidence in the record, we must grant the petition and order the Board to vacate its petition. (*Rosenkrantz, supra*, 29 Cal.4th at p. 658.) In such a case, we 'generally should direct the Board to conduct a new parole-suitability hearing in accordance with due process of law and consistent with the decision of the court, and should not place improper limitations on the type of evidence the Board is statutorily obligated to consider.' (*Prather, supra*, 50 Cal.4th at p. 244.)" (*In re Young, supra*, 204 Cal.App.4th at p. 304.)

Additionally, because the state cannot deprive any person of liberty without due process of law (U.S. Const., 14th Amend., § 1; Cal. Const., art. I, § 7),

"the 'some evidence' test may be understood as meaning that suitability determinations must have some rational basis in fact" (*In re Scott* (2005) 133 Cal.App.4th 573, 590, fn. 6 [34 Cal.Rptr.3d 905]); that is, "the factual basis of a decision by the Board denying parole must be premised upon some evidence relevant to the factors the Board is required to consider." (*In re Rosenkrantz, supra*, 29 Cal.4th at p. 663 (*Rosenkrantz*).) As Justice Liu has recently articulated the proposition, "the focus of judicial review is on the rationality of the Board's . . . decision—not only the ultimate conclusion of current dangerousness but also *the evidence and reasoning on which the Board or Governor actually relied* to reach that conclusion." (*Shaputis II, supra*, 53 Cal.4th at p. 223 (conc. opn. of Liu, J.).)

### There Is Not "Some Evidence" Morganti Would Pose an Unreasonable Risk of Danger to the Public if Released on Parole

The Board's conclusion that Morganti would pose an unreasonable risk of danger to society if released from prison was based on its finding that "Morganti's violent commitment offense, viewed in light of his inadequate insight into his drug abuse, indicated that he was too dangerous to release on parole." According to the Attorney General, the evidence supporting this finding consists of two factors: (1) Morganti's statements to both the Board and the evaluating psychologist that his faith and Catholic upbringing were sufficient to prevent a relapse into substance abuse, and that programs such as Narcotics Anonymous, "while helpful were not essential to his sobriety," and (2) his "lack of insight into the causative factors of his substance abuse."

As we explain, the first factor—which is manufactured by the Board's mischaracterizations of Morganti's statements to the Board and to Dr. Pritchard—does not exist. The second factor is highly questionable, but any lack of insight would not provide a basis for the denial of parole in any event, because there is no evidence such a deficiency, either by itself or in conjunction with the commitment offense, has a rational tendency to show that Morganti currently poses an unreasonable risk of danger.

### No Evidence Shows Morganti Relies Only on His Religious Faith to Prevent Relapse into Substance Abuse, so That His Faith or the Possible Loss of It Is Not Rationally Indicative He Is Currently Dangerous

Apart from relatively brief periods in 2005 and 2006 (during which he was being treated for heart disease and other chronic and degenerative health problems), Morganti has participated in AA and NA for more than 15 years. Not once did he indicate a desire to stop doing so, not once a belief that the

programs were ineffectual. To the contrary, Morganti has repeatedly stated his intention to continue participating in both programs upon release to the community. Indeed, because Morganti is apparently unable to drive, he provided the Board the name of a Healdsburg resident willing to transport him to and from a local AA program. And as he explained at the hearing, he is also corresponding with the New York office of AA for help in obtaining a local sponsor. So far as the record shows, Morganti has never stated a belief that the teachings of the church conflict in any way with those of AA and NA. In fact, he sees his religion and the programs as complementary: in his words, seven of the 12 steps posited by AA and NA "involve a higher power, which to me is Jesus."

The question whether Morganti considered his "Catholic upbringing" sufficient to prevent a relapse into substance abuse, and might therefore cause him to discontinue participation in AA and NA, arose at the hearing when the presiding commissioner asked to see a copy of Morganti's "relapse prevention plan." There, in a portion in which Morganti describes his "evening inventory," he states: "At the end of my day is my evening prayer. To recite Psalm 51, which I have done for over 15 years now. To check off my 12-Steps on NA and make sure I didn't violate any principles. Then to give thanks for another drug free day." A later paragraph in the plan states that, if paroled, "I plan to attend NA meetings in my town, and to participate in those meetings."

After reading the plan, the presiding commissioner pointed out that in his comprehensive risk assessment Dr. Pritchard indicated that Morganti feels participation in AA, NA, and other self-help groups "are not essential to his sobriety" as "he intends to rely on the support of his church . . . ." The presiding commissioner's "concern" was that "what you're saying is that you don't seem to think you have a problem right now with alcohol, with drugs or alcohol, and you don't need a program. That's what I'm hearing you [say], and I want to make sure I'm hearing this right. You say you have your religion to fall back on. You had your religion before, right?" After Morganti informed him that "I lost my religion before I took off down this road," the presiding commissioner responded by pointing out Morganti had lost his religion "because you didn't agree with church doctrine"[6] "[and] then you went down a path of self destruction . . . [s]o, what happens when you have a disagreement with the church doctrine again?" The presiding commissioner

---

[6] So far as the record shows, Morganti's only reason for leaving the church was that "when my grandmother passed away and my mother was trying to become Catholic, to convert into Catholicism, and the church at the time wouldn't let her become a Catholic because she had a previous marriage. And that just turned me."

also thought it significant that Dr. Pritchard also seemed concerned about Morganti's statement to him that the major change in his life is that it is now "drug use versus religion."

Morganti answered by noting that in his written response to Dr. Pritchard's evaluation (which was before the Board) he admitted he "didn't explain myself very well in the statement I made 'it[']s God vs. Drugs.' In the Bible a rich man asked Jesus what he must do to enter heaven. Jesus told him to sell all that he had and follow Him. The man was sad and walked away because he was very rich. You cannot serve two Gods. In the rich man's case it was money and it my case, it used to be drugs. With all the tools from AA and NA and Overcomers Outreach, I have learned and applied them to my life since this tragic crime happened. I know in my heart that I have changed significantly. I cannot serve and follow the ways of God and use drugs also."

It is also important to recall that, unlike the Board, Dr. Pritchard did not suggest Morganti was (or might become) unwilling to participate in AA or NA, or considered them ineffectual, or that he believed the teachings of the Catholic church conflicted with those of AA or NA. Nor did Dr. Pritchard express concern about the possibility Morganti might leave the Catholic Church. Aware that all former substance abusers are exposed to the risk of relapse, and that this possibility is taken into account by the risk assessment tests showing Morganti to be at low risk of recidivism, Dr. Pritchard's main point was that the inherent risk should be mitigated by ensuring Morganti's "*ongoing* participation in NA or AA meetings, adherence to said organizations' guiding principles and/or the maintenance of an AA or NA sponsor *in the free community* . . . ." (Italics added.) Dr. Pritchard's report never even suggests, let alone states, that Morganti's firm "internal realization of the negative consequences of his addiction" is inadequate; all it suggests is that his resolve should be monitored, as could have been and is often required as a special condition of parole. (Cal. Code Regs., tit. 15, § 2281, subd. (b); see also Pen. Code, §§ 3068–3070.) To the contrary, in his report to the Board Dr. Pritchard quotes from Morganti's forthright description and assessment of his past drug use, and characterizes it as a "thoughtful reflection on his history of substance abuse," and the "large" role it played in the commitment offense. In sum, the presiding commissioner's conclusion that Morganti did not consider his continued participation in AA or NA "essential" and might rely only on "his faith and Catholic upbringing" utterly distorts Dr. Pritchard's comments.

Moreover, the presiding commissioner's conclusion inexplicably ignores the evidence—undisputed evidence—establishing Morganti's involvement in AA and/or NA for more than 17 years, his plan to remain involved in those programs if paroled (which can be enforced as a special condition of parole),

and his repeated acknowledgment of the complementary relationship between those programs and his religious faith. For example, Morganti insisted that "I am not downplaying AA or NA, but a person should know 7 out of 12 steps, and be able to talk about them or refer to his higher power. I truly believe that on December 22, 1994, Jesus Christ opened my eyes. I went back to the Catholic church, of which I was raised and rooted in at an early age. *Then I found AA, NA in prison, and both have helped me turn my life around. I honestly believe that Christ opened my eyes and my heart, then he led me to AA, NA, Stress Management and Anger Management. [¶] I do my best each day to practice the principles of NA in my daily affairs.* At the end of each day I go over my successes and my shortcomings, and try to do better as each day comes. Most importantly, I'm happy with another day without drugs." (Italics added.)

At a later point, after questioning Morganti about his confidence that "the Catholic faith is going to keep you on the right path," the presiding commissioner asked Morganti, "If you're depending on the Bible to keep you off substances, do you think that's enough?" Morganti made clear he was not depending just on the Bible, insisting "it's a combination of things I use now. I use the NA. I use the AA. I use my Bible. I use my church." When asked "[a]re you going to get involved in AA or NA if you were to get a date," Morganti answered unequivocally: "Yes, I am." Morganti also explained that his confidence in his ability to remain drug and alcohol free was based not only on the strength of his religious belief, but his degenerating health. Reminding the panel that he was then almost 60 years old and infirm, he said, "I'm paying for the substance abuse right now. I mean, I've had bypass surgery. I'm fighting with Hepatitis C treatments and stuff. I can relate all of these problems right straight back to drugs, the emphysema and everything, so I mean I realize the toll that they've taken on my life."

■ Morganti stated to Dr. Pritchard that he "go[es] to AA and NA now, but [17 years ago] I made a decision that I was a drug addict and since that day I haven't done it at all. It was December 22, 1994. That was the last time. The light went on." Nothing in the record casts doubt on the truth of that statement. The risk a former drug or alcohol abuser will relapse, which can never be entirely eliminated, cannot of itself warrant the denial of parole, because if it did the mere fact an inmate was a former substance abuser would "eternally provide adequate support for a decision that [he] is unsuitable for parole." (*In re Lawrence, supra,* 44 Cal.4th at p. 1226 (*Lawrence*).) This cannot be the case.

The risk an inmate may fall back into alcohol or drug abuse can justify denial of parole only where it is greater than that to which a former drug or alcohol abuser is normally exposed. The Board apparently found such a

greater risk in this case because it considered Morganti's religious faith the sole means he would apply to stay drug and alcohol free. And this means of maintaining abstinence was unreliable, the presiding commissioner appears to have reasoned, because Morganti had once lost his faith and might therefore do so again. If so, the Board seems to have felt, Morganti would be left without any other effective means of remaining drug and alcohol free because he believed participation in 12-step programs like AA and NA were either not essential or were effective only when accompanied by religious faith.[7]

The presiding commissioner's statement that what Morganti was "saying is that you don't seem to think you have a problem right now with alcohol, with drugs or alcohol, and you don't need a program" puts words in Morganti's mouth—words he not only never uttered, but words he repeatedly disclaimed. As the trial court aptly observed, "[t]he mere fact that petitioner may believe that, for him, the most important aspect of his recovery is his faith in religion does not mean that he is discounting or disregarding the importance of A.A. and N.A. programs as an integral part of the recovery process. [Morganti] affirmed that the 12-step program is part of his daily life . . . ." In sum, the Board's conclusion that Morganti relies *only* on his religion to stay away from drugs is unsupported by any evidence.

As earlier explained, the deputy commissioner appears to have voted to deny Morganti parole for the additional reason that the 12-step and other rehabilitative programs he participated in were all either so short, or met so infrequently, or consisted of correspondence courses, or were conducted by video conference, that none could be deemed "comprehensive." If the quality of the rehabilitative programs Morganti participated in were deficient, they were the only ones made available to him by the state. So to deny him parole on that basis is, frankly, outrageous.[8] In 2006, when the Board denied Morganti parole for a period of four years (on the grounds of the gravity of his commitment offense and "lack of insight"), the Board's parting advice to him was "stay discipline free" and "[g]et self-help and, sir, we recommend that you participate in all types of self-help." Morganti did what he was told. It availed him nothing.

---

[7] Because the Board did not state its decision in writing, the only insight we have as to the rationale for finding Morganti currently dangerous is the statements of the two members of the panel at the close of the parole hearing. These statements do not clearly indicate whether the panel or either member found that Morganti regarded AA and NA as ineffective in general or only in his case, due to the strength of his religious faith.

[8] Such condemnation of the programs is also "an affront . . . to the Department of Corrections." (*In re Ramirez* (2001) 94 Cal.App.4th 549, 571 [114 Cal.Rptr.2d 381], disapproved on another ground in *In re Dannenberg, supra*, 34 Cal.4th at pp. 1086–1087, 1100.)

*There Is No Nexus Between Morganti's Insight into the
Causative Factors of His Substance Abuse and the
Conclusion He Presents an Unreasonable Risk to Public
Safety if Released on Parole*

█ As noted, our Supreme Court has "expressly recognized that the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the inmate's dangerous past behavior and the threat the inmate currently poses to public safety. [Citations.]" (*Shaputis II, supra,* 53 Cal.4th at p. 218.) The court emphasized, however, "that lack of insight, like any other parole unsuitability factor, supports a denial of parole only if it is rationally indicative of the inmate's current dangerousness." (*Id.* at p. 219.) Moreover, as has been pointed out, lack of insight is not *necessarily* indicative of present dangerousness, as is "most obviously the case when an inmate, due to advanced age and infirmity, is no longer capable of being dangerous, *no matter how little insight he has into previous criminal behavior.*" (*Id.* at p. 226 (conc. opn. of Liu, J.), italics added.)

Accepting, as we must, that an inmate's insufficient understanding of the causes of his crime is a factor that may show him unsuitable for parole, it is not enough to establish that the inmate's insight is deficient in some specific way. " 'If simply pointing to the existence of an unsuitability factor and then acknowledging the existence of suitability factors were sufficient to establish that a parole decision was not arbitrary, and that it was supported by "some evidence," a reviewing court would be forced to affirm any denial-of-parole decision linked to the mere existence of certain facts in the record, even if those facts have no bearing on the paramount statutory inquiry. Such a standard, because it would leave potentially arbitrary decisions of the Board or the Governor intact, would be incompatible with our recognition that an inmate's right to due process "cannot exist in any practical sense without a remedy against its abrogation." ' ([*Lawrence, supra,* 44 Cal.4th] at p. 1211, quoting *Rosenkrantz, supra,* 29 Cal.4th at p. 664.) 'Accordingly, when a court reviews a decision of the Board or the Governor, the relevant inquiry is whether some evidence supports the *decision* of the Board or the Governor that the inmate constitutes a current threat to public safety, and not merely whether some evidence confirms the existence of certain factual findings.' (*Lawrence, supra,* at p. 1212, citing *Rosenkrantz, supra,* at p. 658.) Stated another way, not only must there be some evidence to support the Board's factual findings, there must be some connection between the findings and the conclusion that the inmate is currently dangerous." (*In re Criscione* (2009) 180 Cal.App.4th 1446, 1458 [103 Cal.Rptr.3d 549]; see *In re Ryner* (2011) 196 Cal.App.4th 533, 545 [126 Cal.Rptr.3d 380].)

The Attorney General contends that the Board's conclusion regarding Morganti's "lack of insight into the causative factors of his substance abuse"

is based upon his attribution of past drug dependency solely to " 'the crowd I was hanging around with' " and his " 'lifestyle' " at the time, and his "failure to address his temper, or how he became so angry that he could stab his friend 26 times." As the Attorney General sees it, Morganti's "lack of sufficient insight into his drug use and its causative factors—as demonstrated by his psychological evaluation and testimony before the Board—constitutes some evidence of current dangerousness."

Considered in its entirety, we find nothing in the record—not in any of the psychological evaluations, not in Morganti's statements to the Board, not in his conduct in prison—indicating that Morganti attributes his drug dependency to others or to his "lifestyle." And nothing in the record indicates that Morganti fails to appreciate the causes of his substance abuse and its relationship to his crime, and his own criminal responsibility. On the contrary, the record indicates that, as Dr. Pritchard put it, Morganti has engaged in "thoughtful reflection" about his substance abuse and its relationship to the homicide he committed. As indeed he did, manifest by Morganti's consistent statements to the Board since becoming eligible for parole.

Morganti elaborated on the causes of his drug dependency, and its relationship to his crime, on numerous occasions, but did so in greatest detail in his seven-page handwritten "Personal Statement." There, in candid detail, Morganti acknowledged the "destructive," "worthless," and "irrational" life he was living at the time he committed his crime; the extent of his drug and alcohol abuse; the pain others suffered as a result of his criminal act; and the relationship between his drug and alcohol abuse and the homicide. He also acknowledged his lack of awareness "that I was abusing drugs to avoid the pain of being divorced by my wife and separated from my children and then watching my father lose a two-year battle with cancer. [¶] After being sentenced to life in prison I had a choice. I could stay at rock bottom, or I could start the long and painful process of facing myself, admitting my fault, understanding my past and building a life worth living." Morganti went on to explain that his drug use progressed from the teenage use of marijuana and LSD to "a gradual lifestyle change that embraced the motorcycle culture, drugs, alcohol, life in the fast lane. . . . My drug use distorted my thinking, priorities and values to such an extent that I acted irrationally with impulsivity and unpredictability, as I did on November 16, 1991," the date he murdered Ron Turner. Morganti stated that he cannot explain the murder, because it was "irrational" and "unexplainable," but that he has come to "understand what caused me to become a murderer. I understand how my drug abuse chipped away at my moral and social foundation. I understand that I am responsible for my violence because I am responsible for myself. I hate who I was then. I hate the man that took Ron's life, that deprived five children of a father and fourteen grandchildren [of] a grandfather and four great grandchildren [of] a great grandfather. I am sorry for the pain and

suffering I inflicted on the community. But I can only despise the man I was then because of the man I have become."

██ It seems to us that the Board's concern was not the absence of Morganti's insight, but the *sufficiency* of his appreciation that his substance abuse was a causative factor in the commission of his crime. We think it appropriate to again point out, as have other courts, that it is questionable "whether anyone can ever fully comprehend the myriad circumstances, feelings, and current and historical forces that motivate conduct, let alone past misconduct." (*In re Ryner, supra,* 196 Cal.4th at p. 548.) Additionally, we question whether anyone can ever adequately articulate the complexity and consequences of past misconduct and atone for it to the satisfaction of everyone. As the California Supreme Court has recognized, "expressions of insight and remorse will vary from prisoner to prisoner and . . . there is no special formula for a prisoner to articulate in order to communicate that he or she has gained insight into, and formed a commitment to ending, a previous pattern of violent behavior." (*In re Shaputis I, supra,* 44 Cal.4th at p. 1260, fn. 18 (*Shaputis I*).)

In sum and in short, we question whether the record can fairly be construed as establishing that Morganti lacks "sufficient" insight into the nature of his past substance abuse and the relationship between that abuse and the commitment offense.

Our doubt, however, is beside the point: the decisive inquiry is not whether there is "some evidence" Morganti "lacks insight" into his past criminal conduct or the cause thereof, but whether he constitutes a current threat to public safety. (*Lawrence, supra,* 44 Cal.4th at p. 1212; *Rosenkrantz, supra,* 29 Cal.4th at p. 658.) In other words, whether there is any *connection* between any lack of insight on his part and the conclusion that he is currently dangerous. Even if—as we do not believe—reasonable minds could find "some evidence" in the record that Morganti lacks a satisfactory level of insight of some sort, the record is manifestly bereft of evidence connecting any such deficit to the conclusion he would present a risk to public safety if released on parole. Morganti's positive institutional behavior, his advanced age, and chronic and degenerative health problems, his lengthy participation in virtually every rehabilitative program available to him, his statements to the psychologists who evaluated him, and his statements to the Board, do not establish any likelihood Morganti would present a risk to public safety if released on parole. They are rationally indicative only of suitability for parole, not unsuitability.

All of the experts who evaluated Morganti felt that he did not pose a security risk. Dr. Petracek opined in 2006 that "[i]f released into the

community, he is considered a low risk of re-offending. He is more than likely to maintain his gains if released. He has demonstrated no propensity to violence within the prison setting to date and is unlikely to do so if released into the community." Dr. Macomber agreed, stating that "[d]rug abuse is no longer a problem in this man's life" and "[h]e does not pose any risk at all to society." The same remained true in 2010, when Dr. Pritchard concluded that "Morganti presents a *LOW RISK* for violence in the free community." As he pointed out, "[f]or all the antisocial behavior demonstrated by his cocaine addiction and penchant for the 'biker philosophy,' his record reflects no violence or crimes outside of the life crime. He has functioned responsibly and compliantly while incarcerated. He is currently 59 years old and in relatively poor health. Despite his cavalier attitude about his personal potential for substance use relapse, he nevertheless presents as an overall low risk to reoffend."

Finally, all of the forensic protocols currently used to assess the risk an inmate may endanger public safety demonstrate only suitability. In 2006 Morganti scored 1.8 on the Level of Service Inventory—Revised (LSI-R) test, which means that " 'if 100 inmates were released on parole, he would do better on parole than 98 percent of them.' " Dr. Macomber stated that at that time Morganti presented " 'no significant risk factors' " and " 'poses less risk to society than the average citizen in the community.' " The three risk assessment protocols applied to Morganti in 2010—i.e., the PCL-R, HCR-20, and LS/CMI tests—also each found that Morganti presented a "low risk" of endangering public safety if released to free society.

We appreciate that the "some evidence" standard is "extremely deferential" (*Rosenkrantz, supra,* 29 Cal.4th at p. 665), that our responsibility is to consider the whole record in the light most favorable to the Board's determination, and that only "a modicum of evidence" is needed to support that determination (*id.* at p. 677). But a determination that an inmate is currently dangerous because he "lacks insight"—or for any other reason—cannot be predicated merely upon "a hunch or intuition." (*Lawrence, supra,* 44 Cal.4th at p. 1213.) Or "guesswork." (*In re Young, supra,* 204 Cal.App.4th at p. 308.) A determination for which there is no evidentiary support—indeed, conflicts with virtually all pertinent evidence—is arbitrary and capricious. It is not rational.

In *Shaputis I,* the Court of Appeal majority concluded that the petitioner's "many years of sobriety, advanced age, and chronic health problems suggest he never again will consume alcohol, will not relapse into violent conduct, and thus does not remain a risk to public safety." (*Shaputis I, supra,* 44 Cal.4th at p. 1260.) The Supreme Court determined that such conclusion "may be reasonable," but it did not prevent the Governor from reversing the Board's

grant of parole, because the Governor found these factors outweighed by the gravity of the commitment offense combined with the "petitioner's lack of insight into his long history of violence—factors that suggest petitioner remains a current danger to the public." (*Id.* at pp. 1260–1261.) There is no "long history of violence" in this case, as the commitment offense was an isolated incident.

The record fully supports the findings of the trial court that there is no evidence rationally indicating that Morganti is blind to the problem presented by his past drug abuse or unwilling to confront the problem, nor reason to think he is likely to resume abusing substances after nearly two decades of abstinence and active participation in AA and NA. As the trial court also found, Morganti's "resolve to put into practice the teachings of A.A. and N.A. and remain drug and alcohol free during periods of time where A.A. and N.A. programs were not available to him in prison provides additional evidence of petitioner's ability to maintain his gains upon release."

The distressing nature of this case arises not just from the Board's distortion of the record, but as well from its abject indifference to the considerable evidence Morganti is unlikely to relapse and is suitable for release.[9] While it is not a basis on which we rely, we cannot help but note both commissioners' indifference to the undisputed factors rationally indicative that Morganti is not currently dangerous: his age; his numerous medical infirmities; and most significantly, the several risk assessments uniformly indicating he was a "low risk." At bottom, the Board's determination of unsuitability rests on little more than the fact that Morganti used drugs 20 years ago and the *possibility* he might relapse. However, as explained in *In re Smith, supra*, 114 Cal.App.4th 343, the fact that an inmate "used drugs extensively more than 20 years ago does not by itself represent some evidence that he is currently dangerous." (*Id.* at p. 371.) With respect to that proposition, almost everything the *Smith* court said of the inmate there can be said of Morganti: "There is no evidence that [his] former desire for drugs

---

[9] *Morganti satisfies almost all of the regulatory criteria indicative of suitability: his juvenile record reflects no history of violent crimes (Cal. Code Regs., tit. 15, § 2402, subd. (d)(1) & (6)); his psychological evaluation indicates no mental health issues, and confirms his matura-tion, growth of understanding, and insight (Cal. Code Regs., tit. 15, § 2402, subds. (c)(5), (d)(3) & (4)); he has developed marketable skills and made realistic plans for his release (Cal. Code Regs., tit. 15, § 2402, subd. (d)(8)); both his psychological evaluations and his advancing age indicate low probability of recidivism (Cal. Code Regs., tit. 15, § 2402, subd. (d)(7)); his conduct in prison has been discipline free, and while in prison he has participated actively and successfully in self-help and substance abuse programming, educational advancement and vocational training (Cal. Code Regs., tit. 15, § 2402, subd. (d)(9)); and his many letters of support demonstrate that he is capable of sustaining stable relationships (Cal. Code Regs., tit. 15, § 2402, subd. (d)(2)). The only regulatory factor missing is that Morganti did not at the time he committed his crime "suffer[] from Battered Woman Syndrome." (Cal. Code Regs., tit. 15, § 2402, subd. (d)(5).)*

might still be a motivating force. The record reveals that he has been clean and sober for a substantial period of time relative to the duration of his abuse. There is no evidence that [he] denies he had a drug problem or denied he had a problem for some period of his incarceration. There is no evidence that he refused, failed, or did poorly in drug treatment programs. And there is no evidence that [he] ever used any type of illicit substance during his incarceration. Nor does the record support a reasonable belief that without further drug treatment *in prison*, [he] might start taking drugs again." (*Ibid.*)

Finally, as also pointed out in *Smith*, "if [an inmate's] past use of drugs did invariably establish his unsuitability, then the Governor [or the Board] could deny parole for the rest of [the inmate's] life based on this immutable factor, without regard to or consideration of subsequent circumstances and evidence indicating that he has no current desire for drugs and that there is little current likelihood of drug relapse, let alone a return to violent conduct as a result of it." (*In re Smith, supra*, 114 Cal.App.4th at p. 372.)

## DISPOSITION

We agree with the trial court that there is not "some evidence" Morganti will pose an unreasonable risk of danger to society if released from prison. We thus affirm the order granting the petition for a writ of habeas corpus.

Lambden, J., concurred.

**KLINE, P. J.,** Concurring and Dissenting.—I concur in the majority opinion in all respects save one.

Christopher Morganti claims not only that the denial by the Board of Parole Hearings (the Board) of his request for parole is unsupported by "some evidence," but also that the Board's disregard for the statutory framework of parole and failure to accord parole applicants individualized consideration deprives him and implicitly all life prisoners a liberty interest safeguarded by article I, section 7, of the California Constitution and the Fourteenth Amendment to the Constitution of the United States. Producing evidence showing that life prisoners are almost never granted a parole release date at the time the Legislature contemplated a date would ordinarily be granted, Morganti requested the opportunity to conduct discovery and have an evidentiary hearing in order to establish a factual basis for his due process claim. The trial court denied the request on the ground Morganti's constitutional argument was "conclusory and fails to state a prima facie claim for relief." Because I believe the ruling erroneous, I would remand this case to the trial court with directions to grant Morganti's request for discovery and an evidentiary hearing.

The evidence Morganti provided in support of this request is undisputed and credible, and the issue he raises bears not only upon the rights of thousands of other life prisoners, but also on the efficacy of the relief properly granted Morganti by the trial court. If it is true, as he claims, that requests for parole are routinely denied on the basis of a Board policy, remanding this matter to the Board for a new parole hearing will not result in the individualized inquiry to which Morganti is entitled. This is not, however, the only or perhaps even the strongest warrant for the discovery and evidentiary hearing Morganti requested.

In addition to his due process claim, Morganti contends the Board administers the law governing the parole process in a manner regularly resulting in the confinement of life prisoners for periods of time disproportionate to their culpability. He seeks an inquiry into the policies and practices responsible for this systematic violation of constitutional rights. The integrity and lawfulness of the parole process pertaining to life prisoners, which Morganti provides reason to question, requires that this judicial inquiry be undertaken.

As will be seen, more prisoners are now being indeterminately sentenced under our nominally determinate sentencing scheme than were ever indeterminately sentenced under the indeterminate sentence law (ISL) (Pen. Code,[1] former § 1168).[2] (See discussion, *post*, at p. 942, fn. 13.) As a result, and as legions of cases like this one show, the problem of disproportionate sentencing, which the DSL was designed to cure, has reappeared with a vengeance. There is, however, a big difference: the administrative safeguard against disproportionality imposed on the parole authority by a frustrated Supreme Court shortly before the ISL was replaced by the DSL (*In re Rodriguez* (1975) 14 Cal.3d 639 [122 Cal.Rptr. 552, 537 P.2d 384]) (*Rodriguez*) (see discussion, *post*, at pp. 939–941) is no longer in effect. The fact that the present parole process lacks the protection against disproportionate sentences imposed by the Supreme Court in *Rodriguez* requires that discovery requests like Morganti's receive serious judicial consideration, as was not here the case.

## I.

Morganti's assertion that the Board disregards the parole scheme pertaining to life prisoners set forth in the DSL focuses on the statement in section 3041 that "[o]ne year prior to the inmate's minimum eligible parole release date," a panel of the Board shall "meet with the inmate and *shall normally set a*

---

[1] All subsequent statutory references are to the Penal Code unless otherwise indicated.

[2] On July 1, 1977, the ISL was repealed and the determinate sentence law (DSL) (§ 1170 et seq.) became effective. (Stats. 1976, ch. 1139, § 273, p. 5140.)

*parole release date . . .* in a manner that will provide uniform terms for offenses of similar gravity and magnitude with respect to their threat to the public, and that will comply with the sentencing rules that the Judicial Council may issue and any sentencing information relevant to the setting of parole release dates." (§ 3041, subd. (a), italics added.)

Morganti's claim that, contrary to the mandate of section 3041, "parole is practically never granted at the initial parole consideration hearing," is based on statistical evidence regarding the Board's parole decisions from January 1, 2000, through October 31, 2010, which he attached as an exhibit to his petition. The exhibit—the accuracy of which was undisputed by the Board in the court below and conceded by the Attorney General at oral argument before this court—shows that during that nearly 10-year period the Board conducted 5,993 initial parole hearings at which parole was granted or denied. In 5,372 of those hearings parole was denied; in 599 the inmate stipulated to being unsuitable for parole,[3] and parole was granted at the initial hearing on only 22 occasions, which constitute 0.37 percent of the 5,993 hearings, or 0.40 percent of the 5,394 hearings at which the inmate did not stipulate to the denial of parole. During the same time period, the Board conducted 5,523 first subsequent parole hearings, including Morganti's, and granted parole only 75 times, or in just 1.3 percent of those hearings.[4]

The seemingly inordinate rate at which life prisoners are found unsuitable for parole—i.e., "an unreasonable risk of danger to society if released from prison" (Cal. Code Regs., tit. 15, § 2402, subd. (a))—is hard to square with the fact that recidivism among life prisoners is less than 1 percent, which is "minuscule" compared to that of other prisoners. (Weisberg et al., Stanford Criminal Justice Center, Life in Limbo: An Examination of Parole Release for Prisoners Serving Life Sentences with the Possibility of Parole in California (Sept. 2011) 1, 17 (Life in Limbo).)[5] The facially inexplicable discrepancy between the extraordinarily high rate at which life prisoners are denied parole, and the extraordinarily low rate at which such prisoners recidivate lends credibility to Morganti's contention that the Board's systematic refusal

---

[3] The explanation for such a significant number of stipulations is noted, *post*, at page 937, footnote 10.

[4] The attorney who authenticated the statistics stated in a declaration submitted under penalty of perjury that he received them from the Board, apparently pursuant to a stipulation, in a writ proceeding in Marin County Superior Court (*In re Rutherford*, case No. SC135399A), in which he assisted in the representation of a class of life prisoners claiming that their parole hearings were untimely pursuant to sections 3041 and 3041.5. That litigation ultimately settled.

[5] This study notes that "among the 860 murderers paroled by the Board since 1995, only *five* individuals have returned to jail or returned to the California Department of Corrections and Rehabilitation[] for new felonies since being released, and none of them recidivated for life-term crimes. This figure represents a lower than one percent recidivism rate, as compared to the state's overall inmate population recommitment rate to state prison for new crimes of 48.7 percent." (Life in Limbo, *supra*, at p. 17, fns. omitted.)

to find life prisoners suitable for release is based on something other than an individualized inquiry into whether life prisoners eligible for parole would pose an unreasonable risk of danger to society if released from prison.

Our agreement with the trial court's determination that the denial of parole to Morganti is unsupported by "some evidence" should not be allowed to obscure Morganti's more consequential constitutional claim, which pertains to the most vexing sentencing issue now regularly confronting the courts of this state: whether the seemingly systematic denial of parole to life prisoners at the hearing specified in section 3041, subdivision (a), is the product of the individualized consideration that is constitutionally required or a thinly veiled policy of "transforming most indeterminate sentences with the possibility of parole into sentences of life-without-parole." (Comment, *Time To Move On: The California Parole Board's Fixation with the Original Crime* (2008) 27 Yale L. & Pol'y Rev. 239.)

The evidence Morganti offered in support of his request for discovery and an evidentiary hearing raises not only the questions whether the Board is systematically violating the legislative mandate and inmates' due process rights, but whether the disconnect between the parole-granting norm pre-scribed in subdivision (a) of section 3041 and actual Board decisionmaking may be the result of, or related to, the Board's practice of delaying the fixing of an inmate's "base term" until after he or she has been deemed suitable for release. (Cal. Code Regs., tit. 15, § 2403, subd. (a).) As I later explain, that practice—which is identical to the practice condemned by our Supreme Court in *Rodriguez, supra,* 14 Cal.3d 639 because it facilitated the imposition of disproportionate sentences and obstructed judicial review of allegedly exces-sive sentences—is among the matters Morganti wishes to investigate and subject to judicial review.

In short, our determination that no evidence supports the Board's denial of Morganti's request for parole leaves entirely unaddressed his claim that the Board denies him and thousands of other life prisoners their constitutional right to individualized consideration of their parole suitability due to (1) a Board policy to almost never grant life prisoners a parole release date at the time the Legislature mandated that such a date should "normally" be granted, and (2) the Board's administration of the parole and term-setting process in a manner that does not guard against but facilitates the disproportionate sentences resulting from application of the policy.

## II.

The majority declines to address these issues because my colleagues agree with the trial court that "the claim is conclusory, and not adequately

developed, and that [Morganti] fails to identify an appropriate remedy in the event he could establish a right to relief." (Maj. opn., *ante*, at pp. 914–915, fn. 4.) The concern that Morganti has not fully developed his constitutional claim, which is true, seems to me unfair, because he was prevented from doing so by the trial court's limitation of its inquiry to whether the decision to deny Morganti parole was supported by "some evidence." Reliance on Morganti's failure to identify an appropriate remedy puts the cart before the horse. He cannot determine that remedy until he is allowed the discovery necessary to establish the factual basis of his constitutional claim and does so. If he establishes the fact, the remedy will not be difficult to fashion.

The Attorney General's arguments why we should not address Morganti's constitutional claim seem to me manifestly untenable. The claim is not before us, she maintains, because " ' "a respondent who has not appealed from the judgment may not urge error on appeal." ' [Citations.]" (*County of Los Angeles v. Glendora Redevelopment Project* (2010) 185 Cal.App.4th 817, 828 [111 Cal.Rptr.3d 104].) Recognizing the statutory exception to this rule (Code Civ. Proc., § 906), which permits a respondent to " 'assert a legal theory which may result in affirmance of the judgment' " (*County of Los Angeles*, at p. 828), the Attorney General argues that "a reviewing court 'need not' consider such claims when the appeal can be decided 'based solely on the issues raised by [appellant].' (*Id.* at pp. 828–829.)" That is the case here, the Attorney General asserts, because this court can determine the propriety of the superior court's order simply by deciding whether some evidence supports the Board's denial of parole.

The course urged by the Attorney General would *always* operate to insulate the constitutional claim from judicial review, *regardless* whether a challenged Board ruling was found supported by "some evidence." If there were not "some evidence," the case would be remanded on this basis and the constitutional claim would be moot; if there were such evidence, its existence would defeat the inmate's claim for relief. The rule that a reviewing court should not entertain a constitutional claim if the party seeking relief can be provided a remedy on a lesser ground is not properly used to effectively immunize from judicial review a government practice credibly claimed to infringe the constitutional rights of a large class of persons. Furthermore, as I have said, it is necessary to address Morganti's constitutional claim to ensure that, upon remand to the Board for a new hearing, his suitability for release is not determined on the basis of a Board policy, as he claims would otherwise be the case.

The Attorney General also contends that the statistics Morganti relies upon are no more impressive than those found inadequate in *In re Rosenkrantz* (2002) 29 Cal.4th 616 [128 Cal.Rptr.2d 104, 59 P.3d 174] (*Rosenkrantz*). In

*Rosenkrantz,* our Supreme Court agreed that evidence indicating a parole decision was made "in accordance with a blanket no-parole policy properly could be considered by a court in determining whether the decision satisfies due process requirements." (*Id.* at p. 684.) The petitioner in *Rosenkrantz* argued that the Governor's reversal of a Board decision granting him parole was based upon an impermissible general policy of automatically denying parole to prisoners convicted of murder. The trial court accepted this argument, relying in part on the Governor's statements, quoted in the Los Angeles Times and authenticated, that murderers, even those with second degree convictions, should serve at least a life term. (*Ibid.*) The trial court also relied on evidence establishing that between January 1999 through April 2001, the Board held 4,800 suitability hearings and granted parole to 48 inmates. The Governor declined to review any cases in which the Board denied parole, and reversed 47 of the 48 in which parole was granted (he subsequently let one other Board decision granting parole stand). (*Id.* at p. 685.) Reversing the trial court's decision, which the Court of Appeal had affirmed, the *Rosenkrantz* court concluded that the evidence relied on by the trial court and the Court of Appeal "does not support its finding that the denial of petitioner's parole was based upon a policy of automatically denying parole to all murderers." (*Ibid.*)

*Rosenkrantz* sets a high standard,[6] but I believe the statistics Morganti produced are adequate for the purpose for which he offered them. For one thing, the statistics at issue in *Rosenkrantz* involved 48 gubernatorial decisions during a period of less than two and one-half years; the statistics Morganti relies upon involve more than 10,000 initial and first subsequent parole hearings over nearly a decade, which is far more indicative of a pattern and practice and the absence of individualized consideration. In any event, unlike the petitioner in *Rosenkrantz,* Morganti does not claim the statistical evidence he provided entitles him to relief; all he claims is that it entitles him to discovery and an evidentiary hearing.

## III.

The manner in which the parole process can impermissibly facilitate disproportionate sentences was first brought to judicial attention in cases arising under the ISL, and these cases continue to be relevant. Moreover, as I will explain, the manner in which the Board now administers provisions of the DSL relating to indeterminate sentencing is similar to the manner in

---

[6] A recent study of the parole decisions of the Board and reversals of Board grants of parole release dates by Governors observes that Governor Davis's reversals of Board grants of parole constituted "a virtual nullification of the law." (Life in Limbo, *supra,* at p. 13.)

which the Adult Authority[7] administered the ISL. The judicial response to the problems created by the administrative practices of the Adult Authority sheds significant light on the present practices of the Board, and raises substantial questions about their effect.

Morganti's constitutional challenge to the manner in which the Board administers the parole process arises out of the conflict between the paramount purposes the DSL was designed to achieve, and the purposes of the indeterminate sentencing carried out under provisions of the DSL applicable to life prisoners such as Morganti. The conflict, and the manner in which the Board attempts to resolve it, warrant brief discussion.

Under the ISL, all convicted felons were indeterminately sentenced. "The court imposed a statutory sentence expressed as a range between a minimum and maximum period of confinement—often life imprisonment—the offender must serve. An inmate's actual period of incarceration within this range was under the exclusive control of the parole authority [(then called the Adult Authority)], which focused, primarily, not on the appropriate punishment for the original offense, but on the offender's progress toward rehabilitation. During most of this period, parole dates were not set, and prisoners had no idea when their confinement would end, until the moment [the Adult Authority] decided they were ready for release." (*In re Dannenberg* (2005) 34 Cal.4th 1061, 1077 [23 Cal.Rptr.3d 417, 104 P.3d 783] (*Dannenberg*).) The perceived deficiencies of indeterminate sentencing at the time the Legislature was considering repealing the ISL and replacing it with a determinate sentencing scheme included not just the uncertainty of the date of release, which created anxiety among prisoners and was deemed an obstacle to rehabilitation, but as well the disparate terms fixed for inmates committed on the same or similar offense, the fixing of terms disproportionate to the offense or otherwise excessive, the broad discretion of the Adult Authority and its relative immunity from judicial review, and increasing doubt about the validity of some of the fundamental premises upon which indeterminate sentencing was based. (Cal. Sen. Select Com. on Penal Institutions, Transcript of Hearing on Indeterminate Sentence Law (Dec. 5–6, 1974); Frankel, Criminal Sentence: Law Without Order (1973); Mitford, Kind and Usual Punishment: The Prison Business (1973) pp. 79–94; American Friends Service Com., Struggle for Justice: A Report on Crime and Punishment in America. (1971); Singer & Statsky, Rights of the Imprisoned (1974) pp. 281–285; Meyerson, *The Board of Prison Terms and Paroles and Indeterminate Sentencing: A Critique* (1976) 51 Wash. L.Rev. 617; Morris, *The Future of Imprisonment: Toward a Punitive Philosophy* (1974) 72 Mich. L.Rev. 1161; Prettyman, *The Indeterminate Sentence and the Right to Treatment* (1972) 11 Am. Crim. L.Rev. 7,

---

[7] The Adult Authority was abolished in 1976 and replaced by the Board of Prison Terms, now known as the Board of Parole Hearings. (§ 5078.)

17–21.) The fundamental problem was not just the reliability of the inherently predictive determination whether an inmate was rehabilitated, which was widely challenged by leading authorities (see, e.g., Diamond, *The Psychiatric Prediction of Dangerousness* (1974–1975) 123 U. Pa. L.Rev. 439), but the *ability* of the state to rehabilitate offenders (Cal. Assem. Com. on Crim. Proc., Crime and Penalties in California (Mar. 1968) summary & p. 4 ["There is no evidence that prisons rehabilitate most offenders."]; Glueck, *Predictive Devices and the Individualization of Justice* (1958) 23 Law & Contemp. Probs., 461–462).

The central theses of the DSL, diametrically opposed to those of the ISL, are reflected in the legislative findings and declarations set forth in its first provision. The DSL commences with the proposition that the purpose of imprisonment for crime is not rehabilitation, but "punishment," and states that "[t]his purpose is best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances." (§ 1170, subd. (a)(1); see also Morris, *The Future of Imprisonment: Toward a Punitive Philosophy, supra*, 72 Mich. L.Rev. 1161.) The Legislature further found and declared "that the elimination of disparity and the provision of uniformity of sentences can best be achieved by determinate sentences fixed by statute in proportion to the seriousness of the offense as determined by the Legislature to be imposed by the court with specified discretion." (§ 1170, subd. (a)(1).)

The DSL establishes a triad of alternative sentences for most felonies. The sentencing court imposes the middle term unless mitigating or aggravating circumstances call for imposition of the specified lower or upper term. Thus, a determinate sentence is tailored primarily to the offense, not the offender, a paradigm that shifts attention away from the rehabilitative sentencing model exemplified by the ISL, which tailored the sentence to the offender, not the offense. However, under the DSL "certain serious offenders, including 'non-capital' murderers . . . , remain subject to indeterminate sentences. These indeterminate sentencees may serve up to life in prison, but they become eligible for parole consideration after serving minimum terms of confinement. [Citation.] As under prior law, life inmates' actual confinement periods within the statutory range are decided by an executive parole agency," which is now the Board. (*Dannenberg, supra*, 34 Cal.4th at p. 1078.)

The most significant tension in the DSL, which has become increasingly problematical and is at the heart of Morganti's constitutional claim, arises from the conflict between its chief purposes—the enhancement of uniform sentencing and the early setting of terms proportionate to the seriousness of the offense—and the perpetuation, with respect to a large and growing number of inmates, of the indeterminate scheme responsible for the problems

of disparate sentencing and disproportionate terms that the DSL was designed to cure.[8] (See *Dannenberg, supra*, 34 Cal.4th at pp. 1080–1083.)

The legislative attempt to reconcile the indeterminate sentencing prescribed by the DSL to the goals of uniformity and proportionality—i.e., the intention "to apply some determinate sentencing principles to life-maximum inmates" (*Dannenberg, supra*, 34 Cal.4th at p. 1083)—is manifested in subdivision (a) of section 3041, the provision upon which Morganti relies. As earlier noted, section 3041, subdivision (a), requires the Board to "normally" set a parole release date at the initial parole hearing "in a manner that will provide uniform terms for offenses of similar gravity and magnitude . . . ." (§ 3041, subd. (a).) The directives of subdivision (a) are, however, significantly qualified by those of subdivision (b). Subdivision (b) declares that the Board "shall set a release date unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting."

The conflict between the relatively objective factors central to determinate sentencing enumerated in subdivision (a) of section 3041 and Board regulations (Cal. Code Regs., tit. 15, §§ 2404, 2405) on the one hand, and the subjective consideration of the inmate characteristic of indeterminate sentencing required by subdivision (b) of section 3041 on the other hand, was almost

---

[8] The majority of such offenders, who are punishable with life imprisonment with the possibility of parole, are those convicted of murder in the first or second degree (§ 190). Other offenses that may be so punishable are kidnapping for ransom, when the victim does not die, does not suffer bodily harm, and was not intentionally confined in a manner that exposed the victim to a substantial likelihood of death (§ 209, subd. (a)); kidnapping for robbery or certain sexual crimes (§ 209, subd. (b)); train wrecking if no one dies as a result of the defendant's act (§ 219); willful and malicious explosion of a destructive device which causes mayhem or great bodily injury to any person (§ 18755, subd. (b)); attempted willful, deliberate and premeditated murder (as defined in § 189), provided that the fact that the murder was willful, deliberate, and premeditated is charged in the accusatory pleading and admitted or found to be true by the trier of fact (§ 664, subd. (a); see § 664, subds. (e), (f) (if victim of the attempt is a designated employee of a law enforcement agency); and aggravated mayhem (§ 205). (5 Cal. Criminal Defense Practice: Sentencing and Probation Posttrial Remedies (2011) § 91.101, pp. 91-368 to 91-370 (rel. 68-12/2011).)

The following sex offenses are also subject to an enhancement of life with the possibility of parole: rape or spousal rape by force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§§ 261, subd. (a)(2), (6), 262, subd. (a)(1), (4)); rape, spousal rape, or sexual penetration, in concert, by force or violence (§§ 261, 262, 264.1); lewd or lascivious act on a child under age 14 or on a dependent person (§ 288, subds. (a), (b)); penetration by a foreign object, by force, violence, duress, menace, or fear of immediate and unlawful bodily injury (§ 289, subds. (a), (k)); sodomy (§ 286, subds. (c)(2), (3), (d); oral copulation (§ 288a, subds. (c)(2), (3), (d)); and continuous sexual abuse of a child (§§ 288.5, 667.61, subd. (c)(9)). (5 Cal. Criminal Defense Practice: Sentencing and Probation Posttrial Remedies, *supra*, § 91.102, pp. 91-370 to 91-372.1 (rel. 68-12/2011).)

immediately seen as presenting a fundamental problem: the extent to which DSL's primary goals of uniformity and proportionality are compromised by Board consideration of postconviction factors in determining whether to grant parole to indeterminately sentenced life prisoners. (See, e.g., Cassou & Taugher, *Determinate Sentencing in California: The New Numbers Game* (1978) 9 Pac. L.J. 1, 86–87.)

A new development has further exacerbated the situation. Historically, when a life prisoner was denied parole, the parole authority was required to set the prisoner's next hearing within 12 months. (§ 3041.5, subd. (b)(2), as added by Stats. 1976, ch. 1139, § 281.8, p. 5152.)[9] Since the enactment in 2008 of Proposition 9, known as "Marsy's Law" (codified at § 3041.5, subd. (b)(3)), a life prisoner denied a release date must now wait at least three years for a new hearing, and possibly as long as 15 years.[10] Thus, when it denied Morganti a parole release date at his initial parole hearing in 2006, the Board deferred his next parole hearing until 2010, thereby increasing his prison term at least four years beyond the point the Legislature contemplated as normative for the setting of a release date. After denying him parole in 2010, the Board deferred the next parole hearing for three more years, thus extending his prison term beyond the norm posited by section 3041 by a total of at least seven years. In short, as Morganti's situation demonstrates, the denial of a parole release is now much more adversely consequential than it has ever been, which heightens the significance of the postconviction factors relied upon by the Board to determine suitability for release on parole.

The Board's ability to defer a subsequent parole hearing for a lengthy period of time also increases the possibility that, as a practical matter, the denial of parole may result in the prisoner serving a term of imprisonment disproportionate to his offense. However, the Board does not fix a prisoner's "base term" until after he or she is found suitable for release, and, as this case demonstrates, judicial review of the denial of a parole date is conventionally limited to inquiring whether it is supported by "some evidence." As a result, most prisoners, the vast majority of whom are unrepresented by counsel in judicial proceedings, are unable to successfully challenge the denial of parole

---

[9] In 1982, section 3041.5 was amended to allow the Board to meet with a prisoner every two years instead of annually. (Former § 3041.5, subd. (b)(2)(A), as amended by Stats. 1982, ch. 1435, § 1, p. 5474.)

[10] This is why a growing number of life prisoners now stipulate to unsuitability or waive the right to a parole hearing. As has been noted, "If an inmate anticipates a high probability of denial of parole at a hearing, s/he often chooses to cancel the hearing as a formal denial by the Board could greatly delay his or her entitlement to a subsequent hearing." (Life in Limbo, *supra*, at p. 11.) Board regulations also promulgated in 2008 provide inmates the right to waive a hearing without stipulating to unsuitability. (Cal. Code Regs., tit. 15, § 2253, subd. (b).)

As noted in the majority opinion (maj. opn., *ante*, p. 914, fn. 4), constitutional challenges to this amendment under the ex post facto clauses of the state and federal constitutions are currently pending before the Supreme Court.

on the ground that it results in the imposition of a disproportionate sentence, *even if, as a practical matter, that is the case*. (Indeed, as explained, *post*, at pp. 941–942, if Morganti had not received judicial relief, by the time of his next parole hearing he would have served a term disproportionate to his crime under Board criteria.)

The difficulty in reconciling the discretion inherent in any indeterminate sentencing with the limits imposed by the principle of proportionality is not a new problem. Morganti's constitutional claim is similar in some respects to that addressed in *In re Minnis* (1972) 7 Cal.3d 639 [102 Cal.Rptr. 749, 498 P.2d 997] (*Minnis*), which arose under the ISL. The inmate in that case contended that although the parole authority evaluated his application for parole according to its usual procedures, which he did not challenge, "it refused to fix his term at less than maximum or to grant him parole on the basis of a 'policy' that prisoners who have sold drugs or narcotics 'purely for profit' should be retained in prison for the maximum term permissible." (*Id.* at p. 642.) The Supreme Court agreed that such a policy "completely disregards the individual prisoner's conduct in prison and his disposition toward re-form. . . . If every offender in a like legal category receives identical punishment, prisoners do not receive individualized consideration . . . [which] violates the spirit and frustrates the purposes of the Indeterminate Sentence Law and the parole system." (*Id.* at p. 645, fn. omitted.) The court concluded: "An administrative policy of rejecting parole applications solely on the basis of the type of offense with the result that the term of imprisonment is automatically fixed at maximum, although the Authority action includes a pro forma hearing and review of the cumulative case summary, does *not* satisfy the requirements of individualized treatment and 'due consideration.' " (*Id.* at p. 647.)

The problem in conducting judicial review of the parole authority's term-fixing practices was discussed in two subsequent cases: *People v. Wingo* (1975) 14 Cal.3d 169 [121 Cal.Rptr. 97, 534 P.2d 1001] (*Wingo*) and *People v. Romo* (1975) 14 Cal.3d 189 [121 Cal.Rptr. 111, 534 P.2d 1015] (*Romo*). The defendants in those cases contended their indeterminate life sentences, deter-mined under the ISL, were excessive and amounted to cruel and unusual punishment. The Supreme Court recognized that "a sentence may be uncon-stitutionally excessive either because the Adult Authority has fixed a term disproportionate to the offense or, *in some circumstances, because no term whatever has been set*." (*Wingo*, at p. 182, italics added.) However, faced with the problems of analyzing the constitutionality of a sentencing statute as applied to a defendant's particular conduct in the absence of a fixed term, it held that "judicial review must await an initial determination by the Adult Authority of the proper term in the individual case. When the term is fixed a court can then analyze the constitutionality of the statute as applied." (*Id.* at p. 183.) Aware that this could cripple an indeterminately sentenced prisoner's

ability to seek judicial relief if the Authority set no term at all, the court further held that "[i]f the Authority, either by omission or by the exercise of its discretion, fails or declines within a reasonable time to set a term, the particular conduct will be measured against the statutory maximum." (*Ibid.*)

The ultimate solution to the problems caused by the Adult Authority's practices presented in *Minnis, Wingo, Romo* and like cases was fashioned by the Supreme Court in *Rodriguez, supra,* 14 Cal.3d 639, which was decided in 1975, while the Legislature was in the process of replacing the ISL with the DSL. Cognizant that administration of the ISL by the Adult Authority countenanced constitutionally impermissible prison terms and complicated judicial review of parole decisions allegedly resulting in excessive terms, the *Rodriguez* court accepted a judicial obligation "to look beyond the facial validity of a statute that is subject to possible unconstitutional administration." The court reasoned that "a 'law though "fair on its face and impartial in appearance" may be open to serious abuses in administration and courts may be imposed upon if the substantial rights of the persons charged are not adequately safeguarded at every stage of the proceedings.' [Citation.]" (*Rodriguez,* at p. 648.) The "obligation to oversee the execution of the penal laws of California extends not only to judicial proceedings," the court stated, "but also to the administration of the Indeterminate Sentence Law." (*Ibid.*) Concluding that the ISL "is not now being administered in a manner which offers assurance that persons subject thereto will have their terms fixed at a number of years proportionate to their individual culpability [citation], or, that their terms will be fixed with sufficient promptness to permit any requested review of their proportionality to be accomplished before the affected individuals have been imprisoned beyond the constitutionally permitted term," the *Rodriguez* court rejected the parole authority's contention that it "has no obligation, either statutory or constitutional, to ever fix [a life prisoner's] term at less than life imprisonment." (*Id.* at p. 650.)

The judicial concern in *Rodriguez* was that the Adult Authority was not complying with the legislative intention that it fix terms within the statutory range prescribed by the ISL "that are not disproportionate to the culpability of the individual offender." (*Rodriguez, supra,* 14 Cal.3d at p. 652.) The source of the problem, the court explained, was the authority's failure to recognize the difference between its responsibility to fix an inmate's "primary term"— which should not be "disproportionate to the culpability of the individual offender" and must "reflect the circumstances existing at the time of the offense"—and its discretionary power to later reduce the term thus fixed, based on postconviction considerations, through exercise of its parole-granting function. (*Id.* at pp. 652–653.) Because it improperly conflated these separate and distinct functions, the Adult Authority did not fix an inmate's primary term until and unless it determined he or she was suitable for parole. The result was that the ISL was "not . . . being administered in a manner

which offers assurance that persons subject thereto will have their terms fixed at a number of years proportionate to their individual culpability [citation], or, that their terms will be fixed with sufficient promptness to permit any requested review of their proportionality to be accomplished before the affected individuals have been imprisoned beyond the constitutionally permitted term." (*Id.* at p. 650.)

The solution decided upon by the *Rodriguez* court was to require the Adult Authority to fix the length of a prisoner's sentence, i.e., the "primary term," shortly after he or she entered prison, and to later, by granting parole, reduce the primary term in "recognition [of] a prisoner's good conduct in prison, his efforts toward rehabilitation, and his readiness to lead a crime-free life in society." (*Rodriguez, supra*, 14 Cal.3d at p. 652.) The court concluded that this "permits the Authority to retain a prisoner for the full primary term if his release might pose a danger to society [citation] and to revoke parole, rescind an unexecuted grant of parole and refix a reduced term at a greater number of years up to the primary term if the prisoner or parolee engages in conduct which affords cause to believe he cannot or will not conform to the conditions of parole, or would pose a danger to society if free. [Citations.]" (*Ibid.*)

The *Rodriguez* court encouraged the Adult Authority to fix prisoners' primary terms promptly, and ensured inmates would be able to obtain review even if it did not, by announcing that, in the future, for purposes of assessing the constitutionality of an inmate's term, "the court will deem it to have been fixed at the maximum if the Authority does not act promptly to fix the primary term of a prisoner committed to the Department of Corrections to serve an indeterminate sentence." (*Rodriguez, supra*, 14 Cal.3d at p. 654, fn. 18.) The *Rodriguez* remedy ensured that the maximum term a prisoner might serve would not be disproportionate to his or her offense or, if it was, an inmate could timely seek and obtain judicial relief.

The *Rodriguez* analysis is directly relevant to the Board's administration of the present parole system, because the Board's regulations reinstate the very practice condemned in *Rodriguez*. As the Supreme Court noted in *Dannenberg, supra*, 34 Cal.4th 1061, Board regulations interpreting subdivision (a) of section 3041 provide that the Board need not set a "base term" until after it first determines that a life prisoner is suitable for release on parole. (*Dannenberg*, at p. 1091, citing Cal. Code Regs., tit. 15, §§ 2402, subd. (a), 2403, subd. (a).) In the view of the *Dannenberg* majority, the function of the "base term" is to "establish[] a parole release date" after "the prisoner is deemed suitable[(—i.e., safe—)]for parole." (*Dannenberg*, at p. 1091.). Under the Board's regulations, the "base term," which is the equivalent of what *Rodriguez* referred to as the "primary term," is "established *solely* on the gravity of the base crime, taking into account all of the

circumstances of that crime" (Cal. Code Regs., tit. 15, § 2403, subd. (a), italics added.)[11] Consideration is limited to the gravity of the offense because the purpose of the "base term" is to ensure life prisoners are not confined for a period of time disproportionate *to their offense*, which the Constitution forbids. The *Rodriguez* court understood that by conflating the setting of terms with the decision to grant parole—that is, by not fixing the term of imprisonment until *after* a prisoner is found suitable for release on parole— the Adult Authority was able to deny a parole release date without inquiring whether a finding of unsuitability would result in a sentence disproportionate to the prisoner's "base crime," i.e., "the most serious of the murders [the prisoner committed] considering the facts and circumstances of the crime." (Cal. Code Regs., tit. 15, § 2403, subd. (a).)

Morganti's situation provides a perfect example of the manner in which the Board's present practice, like that of the Adult Authority in *Rodriguez*, operates to undermine the constitutional principle of proportionality. Morganti was convicted of second degree murder in June 1993. If the Board's denial of his request for parole in 2010 and deferral of his next parole hearing to 2013 were allowed to stand, Morganti would at his next hearing have served 20 years. However, as explained in the margin below, 20 years is *longer* than the *maximum* number of years in the triad of sentences applicable to Morganti's "base crime," second degree murder.[12] In other words, by denying him parole in 2010, and scheduling a subsequent hearing in three years, the earliest allowed under section 3041.5, subdivision (b)(3), the Board has effectively imposed on Morganti a prison term arguably disproportionate to his offense under the Board's own criteria. This shows that under the Board's administration of section 3041, a life prisoner's term of imprisonment is far more

---

[11] The matrix of base terms for second degree murder—which specifies a range of sentence triads ranging from 15, 16, or 17 years at the low end to 19, 20, or 21 years at the high end—is biaxial. The factors included in the first axis all relate to the manner in which the homicide was committed—i.e., whether it was committed (1) indirectly ("e.g., shock producing heart attack, a crime partner actually did the killing"); (2) directly or by the victim ("e.g., victim initiated struggle or had goaded the prisoner"); or (3) death resulted from severe trauma ("e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with weapon not resulting in immediate death or actions calculated to induce terror in the victim"). The factors included in the remaining axes all relate to the relationship between the prisoner and his victim; that is, whether the victim (1) "was accomplice or otherwise implicated in a criminal act with the prisoner during which or as a result of which the death occurred"; or (2) "was involved in a personal relationship with prisoner . . . which contributed to the motivation for the act resulting in death"; or (3) "had little or no personal relationship with prisoner *or* motivation for act resulting in death was related to the accomplishment of another crime." (Cal. Code Regs., tit. 15, § 2403, subd. (c).)

[12] Under the regulation discussed in the preceding footnote, the fact that Morganti's homicide inflicted "severe trauma" on his victim exposes him to three possible base terms ranging from 17, 18, or 19 years to 19, 20 or 21 years; the fact that he and his victim were crime partners limits him to the lowest of the three, which provides for a maximum term of 19 years.

significantly "fixed" by the Board's suitability determination than by its subsequent establishment of the "base term." As I have said, the suitability determination, which focuses narrowly on the perceived dangerousness of the prisoner, diverts attention from the constitutional requirement of proportionality. The Board's regulations therefore invite the constitutional problem addressed in *Minnis, Rodriguez* and other cases and raised again here by Morganti.

Though the Board regulation pertaining to term fixing directs a practice materially the same as that condemned in *Rodriguez*, the *Dannenberg* majority distinguished it on the grounds that section 3041 "partially combined the term-setting and parole functions *Rodriguez* had described as separate under prior law" (*Dannenberg, supra*, 34 Cal.4th at p. 1090), and "the Legislature has not disturbed the Board's interpretation of section 3041 in this fundamental regard." (*Id.* at p. 1091.)[13] Furthermore, under *Dannenberg*, the public-safety provision of subdivision (b) of section 3041 "takes precedence over the 'uniform terms' principle of subdivision (a)" of that statute. (*Dannenberg*, at p. 1082.) As the court said in that case, "[s]o long as the Board's finding of unsuitability flows from pertinent criteria, and is supported by 'some evidence' in the record before the Board [citation], the overriding statutory concern for public safety in the individual case trumps any expectancy the indeterminate life inmate may have in [terms] of comparative equality with those served by other similar offenders." (*Id.* at p. 1084.)

However, the issue germane to Morganti's request for discovery and an evidentiary hearing is not uniformity or the "comparative equality" of sentences, a matter governed by statute, but the proportionality of the punishment imposed on him by the denial of a release date, a matter governed not by statute but by the federal and state Constitutions. Although

---

[13] The *Dannenberg* majority reached this conclusion partly because in 2005 the number of inmates indeterminately sentenced was "but a fraction" of the total prison population, which "diminish[ed] the possibility that the Board's refusal, under section 3041, subdivision (b), to set parole release dates in individual cases will result in the de facto imposition of constitutionally excessive punishment, or will overwhelm the courts' ability to assess claims of constitutional disproportionality." (*Dannenberg, supra*, 34 Cal.4th at p. 1097.)

By 2009, the last year for which reliable statistics are available, the number of indeterminately sentenced prisoners in California had grown to 34,160, about one-fifth of the prison population. (Nellis & King, No Exit: The Expanding Use of Life Sentences in America (The Sentencing Project, July 2009) p. 3.) After the reduction in the size of the nonindeterminately sentenced prison population necessary to comply with the directive of the Supreme Court in *Brown v. Plata* (2011) 563 U.S. ___ [179 L.Ed.2d 969, 131 S.Ct. 1910] indeterminately sentenced prisoners will constitute close to one-third of the total population. The growth in the number of indeterminately sentenced prisoners in California is reflected in the fact that the number of such prisoners in 2009 was 56 percent greater than total prison population in 1976, when the DSL was enacted, which was 21,088. (Cal. Dept. of Corrections, Policy & Planning Div., California Prisoners 1977 and 1978, p. 5.)

the *Dannenberg* majority rejected the remedy employed in *Rodriguez*, it relied on *Rodriguez* (and *Wingo*) to recognize that under the DSL even life prisoners are constitutionally protected from excessive confinement. "Of course," the court stated, "even if sentenced to a life-maximum term, no prisoner can be held for a period grossly disproportionate to his or her individual culpability for the commitment offense. Such excessive confinement, we have held, violates the cruel or unusual punishment clause (art. I, § 17) of the California Constitution. (*Rodriguez, supra*, 14 Cal.3d 639, 646–656; *Wingo, supra*, 14 Cal.3d 169, 175–183.) Thus, we acknowledge, section 3041, subdivision (b) cannot authorize such an inmate's retention, *even for reasons of public safety*, beyond this constitutional maximum period of confinement." (*Dannenberg, supra*, 34 Cal.4th at p. 1096, italics added.)

The point of the foregoing discussion, and indeed of this opinion, is that, because it permits the Board to defer the fixing of the "base term" until after a prisoner is found suitable for release—on the basis of the public safety provisions of section 3041, subdivision (b), which are unrelated to and potentially conflict with the principle of proportionality—*Dannenberg* heightens judicial responsibility to ensure that "the overriding statutory concern for public safety," which "trumps" the statutory interest in uniform sentences (*Dannenberg, supra*, 34 Cal.4th at p. 1084), is not also allowed to "trump" prisoners' constitutional right to sentences proportionate to their offenses. By relying on *Rodriguez*, *Dannenberg* implicitly acknowledges the judicial responsibility to scrutinize Board practices that are allegedly inadequate to safeguard the constitutional rights of prisoners and to craft such remedies as may be needed to ensure against the imposition of disproportionate terms.

Morganti's request for discovery and an evidentiary hearing asks us to discharge this judicial responsibility. What he seeks is an opportunity to persuade the trial court that the Board's systematic denial of parole to life prisoners is not based on individualized inquiry, as required, but on the basis of a policy that violates due process and does not take proportionality into account, a practice that regularly results in life prisoners like him serving periods of confinement disproportionate to their offenses. Basically, like the petitioner in *Rodriguez*, Morganti is saying that section 3041 "is not now being administered in a manner which offers assurance that persons subject thereto will have their terms fixed at a number of years proportionate to their individual culpability [citation.]" (*Rodriguez, supra*, 14 Cal.3d at p. 650.) Also like the petitioner in *Rodriguez*, Morganti wants to litigate his claim now, before his "base term" is fixed, if it ever is, because by then he is certain to have been confined for a period that amounts to a disproportionate term.

The evidence Morganti provided to the trial court entitles him to factually explore and obtain judicial review of the Board policies and practices he claims fail to safeguard the constitutional rights of life prisoners to individualized consideration of their suitability for release on parole and to terms of imprisonment proportionate to their offenses.

On April 16, 2012, the opinion was modified to read as printed above.