Filed 6/25/14  In re Rodriguez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re JOSE RODRIGUEZ<br><br>on<br><br>Habeas Corpus. | D064772<br><br><br><br>(San Diego County<br>Super. Ct. No. CR87615) |

Petition for writ of habeas corpus following a decision by the Board of Parole

Hearings to deny parole.  Relief denied.

Michael Satris, under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Senior Assistant Attorney

General, Phillip Lindsay and Rachael A. Campbell, Deputy Attorneys General, for

Respondent.

INTRODUCTION

A jury convicted Jose Rodriguez of second degree murder and found true an

allegation he personally used a deadly or dangerous weapon when committing the

offense.  (Pen. Code, §§ 187, 12022, subd. (b))[1]  The court sentenced him to an

indeterminate term of 16 years to life in prison.  He first became eligible for parole in

October 1997.

At a parole consideration hearing in 2013, the Board of Parole Hearings (Board)

found Rodriguez unsuitable for parole because he continued to pose a threat to public

safety.  The Board also found it was not reasonably probable he would be suitable for

parole for another five years.  He petitioned this court for habeas relief, contending there

was insufficient evidence to support either finding.  He additionally contends the five-

year parole denial period constitutes an ex post facto law as applied to him.

We conclude the record contains some evidence to support the Board's findings.

We further conclude Rodriguez's ex post facto law contention lacks merit and,

consequently, deny habeas relief.

## BACKGROUND[2]

*Commitment Offense*

The Board based its decision on the factual background contained in our decision

in *People v. Rodriguez* (Mar. 20, 1991, D008556) [nonpub. opn.].  In our decision, we

summarized the factual background as follows:

---

1       Further statutory references are also to the Penal Code unless otherwise stated.

2       At Rodriguez's request, we take judicial notice of the records and files in *In re
Rodriguez* (D057997).  (Evid. Code, §§ 452, subd. (d), 459.)

2

"Rodriguez, an undocumented alien, was hired by Richard Field, Jr. (Richard). Later, Richard's father, Richard Field, Sr. (Field), allowed Rodriguez to live in his home, where he was treated like his own son and referred to Field as 'father.'

"Approximately two years after he began living at the Fields' residence, Rodriguez became sexually involved with Field's wife, Rebecca. In January 1987, Field became suspicious and accused his wife. When she denied his accusations, he confronted Rodriguez at gun point, who also denied any impropriety. Later, Field apologized to Rodriguez. Rebecca was so shaken by the incident; however, she sought professional counseling. She told the psychologist Field kept several guns in the house. Concerned for Rebecca and Rodriguez's safety, the psychologist called the police who confiscated the guns, but returned them before the incident in which Field was killed.

"On February 1, Field visited a neighbor, Georgia Bird, between 5:30 and 6 p.m. appearing 'absolutely normal. Jovial, relaxed. . . . ' That same evening, at approximately 10 p.m., Rodriguez came to Bird's door, distraught and clutching his side. Rodriguez claimed two men had robbed the Fields then shot and killed Field. When the first officer arrived, he found Rodriguez running in front of the Fields' home screaming hysterically. After calming down, Rodriguez related the same story he had told Bird.

"The police found Field dead on the floor with a large pool of blood surrounding his head. Death was caused by multiple skull fractures with intracranial hemorrhage inflicted by a blunt instrument.

"From the time the police first entered the house, they suspected Rodriguez was lying. First, the blood on the floor was dry when the first officer entered the house,

3

indicating some time had elapsed between Field's death and their arrival. Further, a green chair was covered with blood and there was blood splattered on the ceiling above the chair, yet the body was on the floor several feet from the chair.

"While the house did appear to have been ransacked, it was not typical of residential burglaries. For instance, none of Rebecca's fragile belongings were damaged or displaced and only money was taken. Police detectives noted other inconsistencies in Rodriguez's initial burglary story. For example, the robbers killed Field, but only injured Rodriguez. Further, although the robbers allegedly shot Rodriguez in his side, no bullet hole was found in his shirt and no blood was found in the room in which Rodriguez claimed he was shot. Finally, the purported robbers' gun contained only Rodriguez's fingerprints." (*People v. Rodriguez*, *supra*, D008556.)

After Rodriguez received medical treatment for his wound, police detectives conducted a lengthy interview with him, which included two polygraph examinations. "[W]hen Rodriguez was confronted with the results of the final polygraph test, he admitted killing Field. He stated Field, armed with a gun, had again confronted him about his sexual relationship with Rebecca. Fearing for his life, Rodriguez ran out of the house with Field in pursuit. Field told Rodriguez to stop because he did not want to disturb their neighbors. Rodriguez stopped. Both men went to the side of the house to continue their discussion. Suddenly, Rodriguez knocked the gun from Field's hand, grabbed both the gun and a pipe from the flowerbed, and ran into the house followed by Field. As he entered the house, Rodriguez threw the gun on the floor and said, 'If you want to kill me go ahead.' As Field reached for the gun, Rodriguez hit him twice on the

4

head with the pipe because he feared Field was going to shoot him. The victim's body fell into the green chair and slid onto the floor.

"Rodriguez then went to a local bar and paid a friend, Juan Rios, $500 to ransack the house to make it appear as if someone had robbed the place and killed Field in the process. He then shot himself." (*People v. Rodriguez*, *supra*, D008556.)

The Board also relied on information contained in the probation officer's report. In particular, the Board relied on a statement from Rodriguez's admitted accomplice, Victor Arzate,[3] who was found in Mexico with items taken from the Fields' home. "In his statement, Arzate said that he had known [Rodriguez] since childhood . . . . [Rodriguez], he said, had fallen in love with his boss's wife and after drinking at a local bar, the two of them went to the home of the boss. While en route, Rodriguez asked Arzate to help him kill his boss. Rodriguez would be the actual person who committed the murder and Arzate was going to make it appear that the homicide was the result of a robbery. Arzate was supposed to earn $500 for his part. They then went to the residence and after spying on [Field] through the window, Rodriguez took a metal bar out of the car and the two of them entered the home. Without making any noise, Rodriguez struck [Field] across the head. Arzate then picked up [the items he was found with] and ransacked the home. While doing this, Rodriguez told him that the boss was still alive and ordered Arzate to strangle him by the neck until he was dead. Arzate obeyed and he grabbed [Field] by the neck with both hands for approximately five minutes . . . ."

---

3       It is not clear from the record whether Arzate and Rios are the same person.

Arzate did not testify at Rodriguez's trial. The record does not state why; however, there is some indication Arzate was involved in his own criminal proceedings in Mexico at the time. According to the probation officer's report, a few months before Rodriguez's sentencing, Arzate was sentenced to serve 20 years in the Baja California State Penitentiary for his involvement in the crime.

*Rodriguez's Version of Events After His Conviction and Before the 2013 Parole Hearing*

After his conviction, Rodriguez submitted a statement to the probation department detailing his version of events. Specifically, he stated Field confronted him with evidence of the affair, threatened to kill him, and grabbed a gun. He ran outside, Field followed, the two struggled and he took the gun from Field. Field started to hit him. He grabbed a metal stake from the ground and told Field to stay away. Field persuaded him to go back inside the home. Once inside, Field asked him to return the gun and called him "a woman." He cried and begged Field to be allowed to leave, but Field refused to let him go. Field approached him and he pushed Field back into a chair. He put the gun down in front of Field and, when Field tried to grab it, he hit Field with the metal stake. He then shot himself, intending to kill himself. After the first shot, however, he felt severe pain and was too afraid to shoot himself again.

Rodriguez provided a similar version of events to a forensic psychologist who prepared a comprehensive risk assessment for the 2013 parole hearing. One key difference between the two versions is the latter version does not characterize Rodriguez's self-inflicted gunshot wound as a suicide attempt. In addition, Rodriguez told the

forensic psychologist, when Field reached for the gun on the floor, Rodriguez lost control of himself and repeatedly hit Field.

Before the 2013 parole hearing, Rodriguez prepared a package of documents entitled, "Parole Plans and Supporting Documents."  (Some capitalization omitted.)  Included in the package was an "Insight Stat[e]ment," in which Rodriguez discussed his relationship with Field, his relationship with Field's wife, the commitment offense, and his remorse for it.  In the statement, Rodriguez's version of events is substantially similar to the one he provided the forensic psychologist who prepared the comprehensive risk assessment for the 2013 parole hearing.  However, Rodriguez added a few details, including that he and Field's wife were attracted to one another; he was conflicted between his feelings for Field's wife and Field, whom he regarded as a father figure; and he decided he had to end the affair, but he did not have the strength, maturity, bravery, confidence or education to act on his decision.

*Rodriguez's Version of Events at the 2013 Parole Hearing*

At the 2013 parole hearing, Rodriguez's version of events differed from his prior versions in important respects.  He claimed for the first time Field's wife coerced him into starting the affair by threatening to report him to immigration officials if he did not.  When he periodically returned to Mexico, she continually called him and requested he come back to the United States.  He said he felt trapped and did not know how to handle

7

the situation.[4]  He also said he "was living under a lot of guilt, because I was betraying [Field], I was betraying the whole family, I was betraying my own wife, and I was betraying my own cultural princip[le]s."

In addition, while Rodriguez described the same general sequence of events leading up to the killing, he admitted for the first time he did not kill Field in self-defense.  Instead, he said he formed the intent to kill Field when Field accused him of not being a man.  He became angry, lost control of himself, and hit Field on the head several times.  Afterwards, he went outside and got Arzate, who was waiting in Rodriguez's car in front of the Fields' home.  Since Field was still alive then, he had Arzate strangle Field. He then had Arzate ransack and take some things from the Fields' home.  He gave Arzate his car keys and falsely told Arzate he was going to kill himself.  After Arzate left, Rodriguez cut the telephone lines and burned his clothes, which had Field's blood on them.  He subsequently shot himself, ran to a neighbor's house, and told her robbers had come to the Fields' home.

Rodriguez denied he and Arzate planned to kill Field in advance.  Rather, he said they had met up in Escondido earlier in the day.  When it was time for him to return to the Fields' home in National City, Arzate did not want him to leave.  So, he drove Arzate from Escondido to a bar in National City, where they each had a drink and Arzate asked Rodriguez for assistance in finding a job.  Afterwards, they stopped by the Fields' home

---

4       It appears the Board understood him to mean by "trapped" that he felt he had no alternative but to continue with the affair.  In his insight statement, he stated he "felt trapped between divided loyalties" to Field and Field's wife.

so Rodriguez could make himself lunch before driving Arzate back to Escondido. He said he could not have waited to make himself lunch until after he returned from taking Arzate back to Escondido because it would have been too late to make noise in the kitchen. He bought Arzate two beers to drink while Arzate waited in the car.

The Board questioned why he would drive Arzate 50 miles for a couple of drinks and then head back. He said he did it because Arzate was family, they had not seen each other in a long time and Arzate wanted to go with him.

The Board additionally questioned why he did not leave two weeks before the killing when Field first confronted him about the affair and threatened to kill all three of them. He said he made a poor decision. He suggested to Field's wife the possibility of his leaving, but she started crying and told him he was not a man if he left her to deal with the situation herself. Field also told him not to leave until they found a place for him.

The Board further questioned how he could have felt trapped when he had a home and family in Mexico, to which he traveled back and forth. He said he felt trapped because Field's wife "was telling me, 'Come back. Come back.' And to a certain point, even with the distance, she was still trying to control me."

*Pre-Conviction History, Post-Conviction History, and Parole Plans*

Rodriguez was born into a large family in rural Mexico. He and his wife married when they were 18 and have three children together.

When Rodriguez came to the United States, he had limited education and no English language skills. Despite apparent learning difficulties, he is now conversant in

9

English and has completed vocational training in carpentry, roofing, plumbing, and masonry. He has also completed several automotive maintenance courses.

While in prison, his conduct has largely been exemplary. He has numerous laudatory chronos[5] and has been discipline free since 2000. He has actively participated in self-help programs for many years, including substance abuse and anger management programs. In addition, he is a devout Christian and spends much of his free time participating in Christian ministries.

His wife, children, and other family members have supported him throughout his incarceration and plan to continue doing so. When released, he expects to be deported to Mexico, where he will farm land with his brothers.

*Psychological Evaluations*

Approximately five months before the 2013 parole hearing, a forensic psychologist prepared a comprehensive risk assessment. The assessment indicated Rodriguez "made a very good impression," did not have a mental health diagnosis, and was not exhibiting "active signs/symptoms of a major mental illness." The assessment also indicated he posed a low risk for violence in the free community assuming he continued to abstain from substance abuse. Regarding his expressions of remorse and insight into the causative factors of his crime, the assessment indicated his insight was "generally fair," although the assessment additionally noted "[h]e appeared to present

---

5      "A 'chrono' is an institutional documentation of information about inmates and inmate behavior." (*In re Stoneroad* (2013) 215 Cal.App.4th 596, 606, fn. 4.)

10

himself in a somewhat defensive manner" and "made some attempt to portray himself in an overly favorable manner." The assessment further indicated his "planning, execution, and inept attempts to deny responsibility" for the crime were "symptomatic of impaired adaptive abilities." Consequently, the report recommended he continue participating in formal education and enlist the aid of "a mentor, tutor, sponsor, minister, family member, or trustworthy friend" to improve his insight. Finally, the assessment indicated he should explore unresolved anger issues related to his view of Field as a father figure.

*Objections to Parole by District Attorney and Victim's Family*[6]

The San Diego County District Attorney's office objected to Rodriguez's parole, arguing he was unsuitable for parole because "he has not shown enough insight at this point to be a non-danger to the community." To support its position, the district attorney's office argued that, notwithstanding Rodriguez's admission he intended to kill Field, aspects of his version of events were inconsistent with the physical evidence and unbelievable, he continued to portray himself in the best light and as acting defensively, and he had not had an opportunity to explore self-indentified anger and resentment issues.

Field's daughter, son-in-law, and grandchildren appeared at the hearing and also objected to Rodriguez's parole. Among the bases for Field's daughter's objection were

---

[6] The district attorney's and the family's opinions are not evidence of unsuitability for parole, but may influence the weight the Board gives to the evidence. (*In re Vicks* (2013) 56 Cal.4th 274, 308-309 (*Vicks*); *In re Dannenberg* (2009) 173 Cal.App.4th 237, 255, fn. 5; *In re Weider* (2006) 145 Cal.App.4th 570, 590.)

11

the inconsistencies in Rodriguez's versions of events and his portrayal of himself as a victim by deflecting blame onto Field's wife.

*Board's Decision*

After considering the preceding information, as well as the information presented in prior parole hearings, the Board determined Rodriguez posed an unreasonable risk of danger and a threat to public safety and was, therefore, unsuitable for parole. The Board noted there were many circumstances in the record reflecting parole suitability, including Rodriguez's lack of a significant history of violent crime apart from the commitment offense, his age, his marketable skills and reasonable parole plans, and his positive programming while incarcerated. Nonetheless, the Board concluded these circumstances were outweighed by the circumstances tending to show unsuitability, including the circumstances of the commitment offense, his childhood difficulties, his lack of credibility, his lack of adequate remorse, his failure to accept full responsibility for and his minimization of his involvement in the commitment offense by deflecting some blame to Field and Field's wife, and his lack of insight into the underlying causes of the commitment offense. The Board observed, "Since he lacks insight and is still a danger, he cannot develop the requisite skills, the coping mechanisms, that would assure [the Board] that he would not re-offend and therefore would not be dangerous." Finally, the Board agreed with the observation in the comprehensive risk assessment that Rodriguez required further work on his anger issues and, consequently, determined the appropriate length of time to deny parole was five years.

DISCUSSION

I

*Sufficiency of Evidence to Deny Parole*

A

The decision whether to grant parole is an inherently subjective determination. (*In re Rosenkrantz* (2002) 29 Cal.4th 616, 655 (*Rosenkrantz*).) The Board must consider "[a]ll relevant, reliable information available" (Cal. Code Regs., tit. 15, § 2402, subd. (b)) and its decision is guided by the factors identified in section 3041 and the Board's regulations. Among these factors are the nature of the commitment offense, including the inmate's behavior before, during, and after the crime, as well as the inmate's social history, mental state, criminal record, attitude towards the crime, and parole plans. (Cal. Code Regs., tit. 15, §§ 2281, subd. (b), 2402, subd. (b).)

Circumstances tending to show suitability for parole include that the inmate: (1) lacks a juvenile history of violent or potentially violent behavior; (2) has a history of reasonably stable social relationships; (3) has demonstrated remorse and an understanding of the nature and magnitude of the offense; (4) lacks a significant history of violent crime; (5) has a reduced recidivism risk because of age; (6) has realistic parole plans; and (7) has participated in institutional activities demonstrating an enhanced ability to function if paroled. (Cal. Code Regs., tit. 15, § 2402, subd. (d).) Conversely, circumstances tending to show unsuitability for parole include that the inmate: (1) committed the offense in a particularly heinous, atrocious, or cruel manner; (2) possesses a previous record of violence; (3) has an unstable social history; (4) has previously

13

sexually assaulted another individual in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (*Id.*, § 2402, subd. (c).)

These circumstances provide general guidelines. The importance attached to any circumstance or combination of circumstances in a given case is left to the Board's sound judgment. (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 654.) "It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public." (*In re Lawrence* (2008) 44 Cal.4th 1181, 1212 (*Lawrence*).) Consequently, a factor that might not by itself establish an inmate's unsuitability for parole may still contribute to a finding of unsuitability. (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

Our power to review the Board's decision is limited. As long as the Board's decision reflects due consideration of the specified factors as applied to the individual inmate in accordance with applicable legal standards, our review is restricted to ascertaining whether there is some evidence in the record to support the Board's decision the inmate poses a current threat to public safety. (*Lawrence*, *supra*, 44 Cal.4th at p. 1212; *Rosenkrantz*, *supra*, 29 Cal.4th at p. 677.) " 'Some evidence' " in this context means a modicum of evidence. (*In re Shaputis* (2011) 53 Cal.4th 192, 210 (*Shaputis II*).)

Here, the Board based its decision partially on the circumstances of the commitment offense, which the Board found was committed "in an especially gruesome, heinous, and brutal manner." The circumstances of the commitment offense are an

14

appropriate consideration in determining parole suitability. (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1).) Among the signs of an especially heinous commitment offense are: "[t]he victim was abused, defiled or mutilated during or after the offense"; "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering"; and "[t]he motive for the crime is inexplicable or very trivial in relation to the offense." (Cal. Code Regs., tit. 15, § 2402, subd. (c)(1)(C)-(E).) Each of these signs is present in this case. We, therefore, have no difficulty concluding there is at least a modicum of evidence to support the Board's characterization of the circumstances of the commitment offense. Nonetheless, as the Board recognized, the circumstances of the commitment offense are not sufficient to justify a decision to deny parole unless the circumstances, when considered in light of the other facts in the record, demonstrate the inmate is currently dangerous. (*In re Shaputis* (2008) 44 Cal.4th 1241, 1254-1255 (*Shaputis I.*))

The Board additionally based its decision on concerns about the level of Rodriguez's acceptance of responsibility and insight into what caused him to kill Field. An inmate's acceptance of responsibility and development of insight are also appropriate considerations in determining parole suitability. (Cal. Code Regs., tit. 15, § 2402, subd. (d)(3); *Shaputis I, supra*, 44 Cal.4th at p. 1246.) Moreover, an inmate's lack of insight into and understanding of the behavior underlying the commitment offense can support a conclusion the inmate is currently dangerous. (*Shaputis I*, at p. 1260.) Indeed, the California Supreme Court has specifically recognized "the presence or absence of insight is a significant factor in determining whether there is a 'rational nexus' between the

15

inmate's dangerous past behavior and the threat the inmate currently poses to public safety." (*Shaputis II*, *supra*, 53 Cal.4th at pp. 218.)

Expressions of remorse and demonstration of insight will vary from inmate to inmate and there are no special words for an inmate to articulate in order to communicate he or she has committed to ending a previous pattern of violent or antisocial behavior. (*Shaputis I*, *supra*, 44 Cal.4th at p. 1260, fn. 18.) While Rodriguez acknowledged responsibility and articulated remorse for his crime, his version of events has continued to evolve over time, which, in the Board's view undermined his general credibility. It also suggested he was still grappling with what happened and why. The comprehensive risk assessment supported the Board's view. The assessment described his insight as "generally fair," which connotes both that he possesses some insight and that there are additional gains for him to make. The assessment also stated he tended to portray himself in an overly favorable and defensive manner, he needed to enlist the aid of a trusted third party to help him improve his insight, and he needed to explore unresolved anger issues.

Consistent with the assessment's characterization of his portrayal of himself, Rodriguez attempted to shift some blame to Field's wife at the parole hearing by claiming she coerced him into starting their affair and badgered him into continuing it despite his better judgment. He also attempted to minimize his actions by claiming Field goaded him into a homicidal rage by insulting his masculinity. Given these circumstances, we conclude there is at least a modicum of evidence to support the Board's conclusion Rodriguez was currently dangerous because he had not accepted full responsibility and did not possess adequate insight into why he murdered Field.

16

B

Rodriguez contends the Board's reasons for denying him parole amount to an unlawful insistence he admit he is guilty of premeditated murder as a condition of receiving a parole date.  We disagree.

"The Board of Prison Terms shall not require, when setting parole dates, an admission of guilt to any crime for which an inmate was committed."  (§ 5011, subd. (b).)  However, when, as here, an inmate provides the Board with the inmate's version of events, neither section 5011, subdivision (b), nor title 15, section 2236 of the California Code of Regulations preclude the Board from considering the plausibility of the inmate's version of events to the extent it bears on the inmate's parole suitability.  To the contrary, the Board is required to consider "[a]ll relevant, reliable information available" when determining an inmate's parole suitability.  (Cal. Code Regs., tit. 15, § 2402, subd. (b).)

Thus, an inmate with a plausible account, who has accepted responsibility for his or her professed actions, expressed remorse, effectively participated in rehabilitative programs, and been found by a psychologist to present a low recidivism risk may be suitable for parole notwithstanding the inmate's claim of innocence or reduced culpability.  (See, e.g., *In re Pugh* (2012) 205 Cal.App.4th 260, 269; *In re Jackson* (2011) 193 Cal.App.4th 1376, 1389-1391; *In re Palermo* (2009) 171 Cal.App.4th 1096, 1110-1112, disapproved on another ground in *In re Prather* (2010) 50 Cal.4th 238, 252–253.)  Conversely, an inmate with an implausible account, but an otherwise exemplary prison record, may be unsuitable for parole if the implausibility of the inmate's account indicates the inmate does not appreciate the magnitude of the commitment offense or its

17

contributing causes and there is psychological evidence the inmate's character has not appreciably changed since the commitment offense. (See, e.g., *In re Shaputis I*, *supra*, 44 Cal.4th at p. 1260; *In re McClendon* (2003) 113 Cal.App.4th 315, 321-322.) As one appellate court explained, "where the inmate's version of events is contrary to the facts established at trial and is inherently improbable, this reflects on the inmate's credibility, and indicates a refusal to admit the truth to himself and to others. This establishes a nexus to current dangerousness because it indicates the inmate is hiding the truth and has not been rehabilitated sufficiently to be safe in society." (*In re Pugh*, *supra*, 205 Cal.App.4th at p. 273.)

In this case, although Rodriguez admitted intentionally killing Field, numerous aspects of his version of events are doubtful. For instance, a few weeks before the murder, Field purportedly confronted him with a gun and threatened to kill him. Yet, he did not leave the Fields' home at that time because Field and Field's wife asked him to stay. Then, on the day of the murder, Field again confronted Rodriguez with a gun, which Rodriguez managed to get away from him. However, instead of running to his waiting friend and waiting car, he went inside the house with Field and purposely placed the gun within Field's reach. While he stated he did this to prompt Field to bend over so he could hit Field on the head, it is unclear why such a ploy was necessary. Moreover, it makes little sense for a person admittedly intent on killing to give his adversary access to a superior weapon.

Rodriguez's explanation for how Arzate came to be at the Fields' home is dubious as well. As the Board pointed out, it is improbable Rodriguez picked up Arzate and

18

embarked on a 100-mile roundtrip excursion just so they could have a few drinks together at a bar. There were undoubtedly other bars closer to Arzate's residence where two old friends could catch up with one another. Also troubling, Rodriguez stated at least part of Field's armed confrontation with Rodriguez occurred outside where Arzate was purportedly waiting. Yet, Arzate did not intervene until Rodriguez enlisted his aid after the murder.

The doubtfulness of aspects of Rodriguez's account coupled with his statements deflecting blame and minimizing his actions tend to show Rodriguez does not fully appreciate the magnitude of the commitment offense or its contributing causes. As discussed above, the comprehensive risk assessment supports this view. Accordingly, we conclude the Board's skepticism of Rodriguez's account did not violate section 5011, subdivision (b).

## C

In addition to the circumstances of the commitment offense and concerns about Rodriguez's responsibility and insight, the Board also based its decision on what it characterized as an unstable social history. This history included the death of his father when he was one, indications of physical abuse by his mother, and his need to leave school at an early age to work and support his family. Rodriguez contends the Board acted arbitrarily and capriciously in denying parole on this basis because the evidence does not support a finding his mother abused him, a Board policy precludes it from using an inmate's victimization experiences as an unsuitability factor, and Rodriguez's childhood experiences tended to show stability rather than the converse.

19

Assuming, without deciding, the Board considered Rodriguez's childhood experiences in an impermissible manner, the error does not require reversal of the Board's decision. " 'We may uphold the parole authority's decision, despite a flaw in its findings, if the authority has made clear it would have reached the same decision even absent the error. [Citation.]' [Citation.] As long as 'those portions of the decision that are supported by some evidence constitute a sufficient basis supporting the . . . discretionary decision to deny parole . . . ,' the decision satisfies the requirements of due process." (*In re Reed* (2009) 171 Cal.App.4th 1071, 1086, quoting *In re Dannenberg* (2005) 34 Cal.4th 1061, 1100 & *Rosenkrantz*, *supra*, 29 Cal.4th at p. 677.)

As previously discussed, Rodriguez's continually evolving version of events, his deflection of blame, his minimization of his actions, and the other evidence of insight and responsibility deficits provided sufficient evidence to support the Board's decision. It is apparent from the Board's remarks during the parole hearing that the Board rested its decision as much or more on these deficits as it did on any other factor. Consequently, we have no difficulty concluding the Board would have reached the same decision even if had not considered Rodriguez's childhood experiences adversely.

II

*Ex Post Facto Violation*

A

In 2008 California voters approved Proposition 9, known as "Marsy's Law." (*Vicks*, *supra*, 56 Cal.4th at p. 278.) Among its effects, it amended section 3041.5 to "increase the period of time between parole hearings but allow for the advancement of a

20

hearing if a change in circumstances or new information subsequently establishes that there is a reasonable probability the prisoner is suitable for parole." (*Vicks*, at p. 278.)

Former section 3041.5 required the Board "to provide annual parole hearings following the initial hearing, except that a hearing could be deferred for (1) up to two years 'if the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following year and states the bases for the finding' or (2) up to three years 'if the prisoner has been convicted . . . of more than one offense which involves the taking of a life, and the board finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding.' [Citation.] Thus, at the time [Rodriguez] committed his crime[], he was entitled to an annual parole hearing unless the Board found that it was not reasonable to expect that he would be granted parole in a year, in which case his parole hearing could be deferred for up to two years." (*Vicks*, *supra*, 56 Cal.4th at pp. 283-284.)

Current section 3014.5 parole hearing "deferral periods range from a default period of 15 years to a minimum of three years. More specifically, the next hearing is to occur in 15 years, 'unless the board finds by clear and convincing evidence that the criteria relevant to the setting of parole release dates . . . are such that consideration of the public and victim's safety does not require a more lengthy period of incarceration for the prisoner than 10 additional years.' (§ 3041.5, subd. (b)(3)(A).) If the Board makes such a finding, the next hearing shall be in 10 years unless the Board finds, again by clear and convincing evidence and considering the same criteria and considerations, that a period of more than seven years is not required. (§ 3041.5, subd. (b)(3)(B).) In that event, the

21

next hearing shall be in three, five, or seven years.  (§ 3041.5, subd. (b)(3)(C).)"  (*Vicks, supra*, 56 Cal.4th at p. 284, fn. omitted.)

The Board applied Marsy's Law in this case to set Rodriguez's parole hearing deferral period at five years.  Rodriguez contends the application of Marsy's Law to him violates ex post facto principles.[7]

### B

Both the federal and state constitutions proscribe ex post facto laws.  (*Vicks, supra*, 56 Cal.4th at p. 287.)  One function of these proscriptions "is to bar enactments which, by retroactive operation, increase the punishment for a crime after its commission.  [Citations.]  Retroactive changes in laws governing parole of prisoners, in some instances, may be violative of this precept."  (*Garner v. Jones* (2000) 529 U.S. 244, 249-250 (*Garner*); *Vicks,* at p. 287.)  Whether the application of Marsy's Law to Rodriguez is an ex post facto violation depends on whether its application "creates a significant risk of prolonging [Rodriguez's] incarceration."  (*Garner*, *supra*, at p. 251.)  To establish an as applied violation, Rodriguez "must demonstrate, by evidence drawn from the [law's] practical implementation by [the Board], that its retroactive application will result in a longer period of incarceration than under the earlier [law]."  (*Id.* at p. 255; *Vicks*, at p. 312.)

---

7      A party may assert a statute violates ex post facto law principles both on its face and as applied.  (See, e.g., *Vicks*, *supra*, 56 Cal.4th at pp. 278-279.)  Rodriguez is asserting only an as applied challenge.  The California Supreme Court has previously concluded Marsy's Law does not violate ex post facto law principles on its face.  (*Vicks*, at p. 279.)  This conclusion is binding on us.  (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In this case, Rodriguez has not submitted any evidence the law's practical implementation by the Board will result in a longer period of incarceration for him. The stipulations, documents from other cases, and attorney declaration he submitted are, at worst, not evidence at all or, at best, not evidence of Marsy's Law application to him. (See, e.g., *Vicks*, *supra*, 56 Cal.4th at pp. 313-315.) Thus, we have no factual basis to conclude there is a significant risk application of the law to him will result in a longer period of incarceration.

Nonetheless, Rodriguez asserts his history of short parole hearing deferral periods and the dearth of evidence to support his current parole denial provides him with a reasonable basis for suspecting he would be found suitable for parole sooner than his next scheduled parole hearing. He further asserts the provisions available to advance his next parole hearing are inadequate because they provide no practical possibility of an annual parole hearing, "[h]e has obtained no advancement of any hearing set for him, and the Board's track record . . . gives him little hope that his next hearing . . . will be advanced."

We are not persuaded by either assertion. As we explained in part I, *ante*, there is ample evidence to support both the current parole denial and the five-year parole hearing deferral period. In addition, "Marsy's Law did not alter the criteria for obtaining release. By reducing the frequency of hearings at the outset and allowing the advancement of a hearing date 'when a change in circumstances or new information establishes a reasonable likelihood that consideration of the public and victim's safety does not require the additional period of incarceration of the prisoner' [citation], Marsy's Law affords prisoners an opportunity to have their suitability for parole considered when there is a

23

reasonable likelihood they are suitable. [Rodriguez] does not indicate that he has requested an advanced hearing date or that there is any changed circumstance or new information that would support a conclusion that there is a reasonable likelihood he is suitable for parole. Thus, it does not appear that he has lost an opportunity to serve less time due to the longer delay before his next parole suitability hearing." (*Vicks*, *supra*, 56 Cal.4th at p. 312.)

Further, as the California Supreme court has also explained, "if the Board makes a finding by clear and convincing evidence that a deferral period of more than seven years is not required, the Board has discretion to schedule the next hearing in seven, five, or three years; there is no additional finding required to set the next hearing for three rather than five years later. (§ 3041.5, subd. (b)(3)(C).) The fact that the Board deferred [Rodriguez's] hearing for five years, despite its discretion to set the hearing for three years, establishes that it would not have exercised its discretion to set the next hearing within the time limits existing under the prior law." (*Vicks*, *supra*, 56 Cal.4th at pp. 312-313.)

Finally, after the briefing in this case was completed, a federal district court determined the parole hearing deferral provisions in Marsy's Law violate a class of inmates' ex post facto rights and enjoined the Board from applying the provisions to the class. (*Gilman v. Brown* (E.D. Cal. Feb. 27, 2014) 2014 U.S. Dist. LEXIS 26386, *19, 46, 70, 82.) The injunction was to take effect 31 days after the court's decision unless a timely appeal is filed. (*Id*. at p. *83.)

24

We requested and received supplemental briefing on the application of the decision to this case. We conclude the decision does not apply for two reasons. First, federal district court decisions are not binding on us. (*Castaneda v. Department. of Corrections & Rehabilitation* (2013) 212 Cal.App.4th 1051, 1074.) Second, and perhaps more importantly, the evidence upon which the federal district court based its decision is not properly before us. Thus, Rodriguez cannot rely upon the decision to meet his burden of establishing a prima facie case for relief. (*People v. Duvall* (1995) 9 Cal.4th 464, 474 [to state prima facie case for relief, inmate must (1) state facts underlying claim fully and with particularity, and (2) "include copies of reasonably available documentary evidence supporting the claim."].)

DISPOSITION

Relief denied.

McCONNELL, P. J.

I CONCUR:

HALLER, J.

25

Aaron, J., dissenting:

Penal Code section 3041, subdivision (d) " 'mandates that the Board 'normally' set a parole date for an eligible inmate . . . unless it determines that [the] inmate poses a *current threat* to public safety.' (*In re Prather* (2010) 50 Cal.4th 238, 249 (*Prather*), quoting *In re Lawrence* (2008) 44 Cal.4th 1181, 1202 (*Lawrence*))." (*In re Riley* (May 22, 2014, No. A137349 [2014 WL 2142367 at \*10] (*Riley*), italics added.) "The nexus to current dangerousness is critical." (*Id*. at \*11.) In *Lawrence* and *In re Shaputis* (2008) 44 Cal.4th 1241 (*Shaputis I*), the California Supreme Court clarified that, "in evaluating a parole-suitability determination by either the Board or the Governor, a reviewing court focuses upon 'some evidence' supporting the core statutory determination that a prisoner remains a current threat to public safety—*not merely 'some evidence' supporting the Board's or the Governor's characterization of facts contained in the record*." (*Prather, supra,* at pp. 251–252, italics added.)

Thus, as the majority acknowledges, " 'It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public.' " (Maj. opn. at p. 14, quoting *Lawrence, supra,* 44 Cal.4th at p. 1212.) "[B]ecause the paramount consideration for both the Board and the Governor under the governing statutes is whether the inmate currently poses a threat to public safety, and because the inmate's due process interest in parole mandates a meaningful review of a decision denying parole, the proper articulation of the standard of review is whether there exists 'some evidence' demonstrating that an inmate poses a current threat

to public safety, rather than merely some evidence suggesting the existence of a statutory factor of unsuitability." (*Prather*, *supra*, 50 Cal.4th at p. 252, citing *Lawrence*, *supra*, 44 Cal.4th at p. 1191.)

"If simply pointing to the existence of an unsuitability factor and then acknowledging the existence of suitability factors were sufficient to establish that a parole decision was not arbitrary, and that it was supported by 'some evidence,' a reviewing court would be forced to affirm any denial-of-parole decision linked to the mere existence of certain facts in the record, even if those facts have no bearing on the paramount statutory inquiry. Such a standard, because it would leave potentially arbitrary decisions of the Board or the Governor intact, would be incompatible with our recognition that an inmate's right to due process 'cannot exist in any practical sense without a remedy against its abrogation.' " (*Lawrence, supra,* 44 Cal.4th at p. 1211, quoting *In re Rosenkrantz* (2002) 29 Cal.4th 616, 664 (*Rosenkrantz*).)

The factors that the Board cited in denying Rodriguez parole are 1) the circumstances of the commitment offense; 2) his "unstable social history"; 3) his failure to accept full responsibility for, and his minimization of, his involvement in the commitment offense by deflecting some blame to Field and Field's wife; and 4) his lack of insight into the underlying causes of the commitment offense. While there may be some evidence in the record that supports the Board's characterization of the facts and/or its findings of the existence of statutory factors of unsuitability, the Board has entirely failed to articulate any nexus between its stated reasons for denying parole and a conclusion that Rodriguez would pose a current threat to public safety if released.

2

Instead, in a conclusory and circular statement, the Board asserts, "Since [Rodriguez] lacks insight and is still a danger, he cannot develop the requisite skills, the coping mechanisms, that would assure [the Board] that he would not reoffend and therefore would not be dangerous."

In fact, the comprehensive risk assessment prepared by the forensic psychologist before the 2013 parole hearing concluded that Rodriguez poses a *low risk* of violence if paroled. There is nothing in the record that would support a contrary finding.

With respect to the significance of the circumstances of the commitment offense in determining suitability for parole, while " 'the Board and the Governor may rely upon the aggravated circumstances of the commitment offense as a basis for a decision denying parole, the aggravated nature of the crime does not in and of itself provide some evidence of *current* dangerousness to the public unless the record also establishes that something in the prisoner's pre- or postincarceration history or his or her current demeanor and mental state, indicates that the implications regarding the prisoner's dangerousness that derive from his or her commission of the commitment offense remain probative of the statutory determination of a continuing threat to public safety.' " (*Riley*, *supra*, 2014 WL 2142367 at \*15, quoting *Lawrence*, *supra*, 44 Cal.4th at p. 1214.) Even assuming that the record in this case supports the Board's determination that the commitment offense was "especially heinous" (which, in my view, it does not), there is simply no evidence that would indicate the existence of *anything* in Rodriguez's pre- or postincarceration history or his current demeanor and mental state that would meet the test set forth above.

3

As to the second factor cited by the Board, Rodriguez's alleged "unstable social history," the majority rightly discounts this factor since there is no evidence in the record that would support a finding that Rodriguez in fact has an unstable social history.

With respect to the third factor, i.e., a failure to accept full responsibility for, and minimization of, involvement in the commitment offense as indicated by Rodriguez deflecting some blame to Field and Field's wife, even assuming that the Board's finding in this regard is accurate,[1] the Board has entirely failed to articulate any nexus between this factor and current dangerousness on Rodriguez's part.

Finally, with respect to a lack of insight, while " ' [c]onsideration of an inmate's degree of insight is well within the scope of the parole regulation' " (*Riley*, *supra*, 2014 WL 2142367 at *12, quoting *In re Shaputis* (2011) 53 Cal.4th 192, 218), "the critical question is whether there is some evidence in the record to support the conclusion that whatever deficiency may exist in petitioner's understanding of the forces that led him to commit the murder[ ] demonstrates that petitioner currently poses a threat to public safety."  In *In re Morganti* (2012) 204 Cal.App.4th 904, the court reversed the Board's denial of parole, concluding that the Board had failed to articulate any connection between any lack of insight on the part of the inmate and the conclusion that he was currently dangerous.  The court observed, "Even if—as we do not believe—reasonable minds could find 'some evidence' in the record that Morganti lacks a satisfactory level of

---

[1]    In this regard, it is worth noting that in the weeks prior to the murder, Field threatened Rodriguez at gunpoint over Rodriguez's affair with Field's wife.

insight of some sort, the record is manifestly bereft of evidence connecting any such deficit to the conclusion he would present a risk to public safety if released on parole." (*Id.* at p. 925.)  The *Morganti* court asserted, "Morganti's positive institutional behavior, his advanced age, and chronic and degenerative health problems, his lengthy participation in virtually every rehabilitative program available to him, his statements to the psychologists who evaluated him, and his statements to the Board, do not establish any likelihood Morganti would present a risk to public safety if released on parole.  They are rationally indicative only of suitability for parole, not unsuitability."  (*Ibid.*)

With the exception of the reference to Morganti's health problems, all of the observations that the *Morganti* court made about the inmate in that case apply to Rodriguez.  As the majority acknowledges, Rodriguez's conduct in prison has "largely been exemplary," he has "numerous laudatory chronos," he has "actively participated in self-help programs for many years, including substance abuse and anger management programs," and he "is a devout Christian and spends much of his free time participating in Christian ministries."  In addition, "[h]is wife, children and other family members have supported him throughout his incarceration and plan to continue doing so."  (Maj. opn. at p. 10.)  As in *Morganti*, even assuming a lack of "a satisfactory level of insight of some sort" (*Morganti*, *supra*, 204 Cal.App.4th at p. 925) on Rodriguez's part, there is simply no evidence in the record that he would present a risk to public safety if released on parole.  There is nothing in the record to suggest that Rodriguez's offense was anything other than "a one-time occurrence, neither preceded nor followed by any evidence of petitioner having a violent nature."  (*Riley*, *supra*, 2014 WL 2142367 at *14.)

5

Like the *Lawrence* court, I appreciate that "the 'some evidence' standard is extremely deferential" (*Rosenkrantz, supra,* 29 Cal.4th at p. 665), that our responsibility is to consider the whole record in the light most favorable to the Board's determination, and that only "a modicum of evidence" is needed to support that determination. (*Lawrence*, *supra*, 44 Cal.4th at p. 1226.) However, I also agree with that court's observation that, a determination that "an inmate is currently dangerous" because he "lacks insight"—or for any other reason—cannot be predicated merely upon "a hunch or intuition," or guesswork. (*Ibid.* at pp. 1213 & 1228.) A determination for which there is no evidentiary support—indeed, conflicts with virtually all pertinent evidence—is arbitrary and capricious. It is not rational.

A faithful application of *Lawrence* makes clear that Rodriguez's case for parole is equally, if not more, compelling than was Lawrence's. To begin with, like Lawrence, Rodriguez had no criminal history prior to the commitment offense, has followed the rules in prison, and has participated in numerous self-help and vocational programs while in prison. Further, the record unequivocally demonstrates—as did the record in *Lawrence*—that the commitment offense was perpetrated under "the stress of an emotional love triangle." (*Lawrence*, *supra*, 44 Cal.4th at p. 1225.) Moreover, the Supreme Court noted that Lawrence's murder of her lover's wife was "an isolated incident, committed while petitioner was subject to emotional stress that was unusual or unlikely to recur." (*Shaputis I*, *supra*, 44 Cal.4th at p. 1259.) The record establishes that Rodriguez's murder of Field was committed while Rodriguez was in a similar emotionally stressful situation that is not likely to recur.

6

Lawrence committed a *first degree murder* by planning to shoot and stab a completely blameless victim (her lover's wife) multiple times, and executing that plan. (*Lawrence*, *supra*, 44 Cal.4th at p. 1193.)  Rodriguez, in contrast, committed a *second degree murder* by bludgeoning to death a man who had recently threatened to kill him, at gunpoint.  Lawrence callously described the killing to family members as a "birthday present," remained a fugitive for many years, and upon being arrested by the police, claimed that the victim's husband had committed the murder.  (*Ibid.*)  Rodriguez confessed to the killing within days of the offense and has long expressed his remorse for his actions.  While Lawrence displayed features of "three psychological disorders— borderline personality disorder, antisocial disorder, and avoidant personality disorder" (*id*. at pp. 1194-1195)—during the initial period of her incarceration, there is no evidence that Rodriguez has ever suffered from any mental illness.

In sum, because the record is "manifestly bereft" (*Morganti*, *supra*, 204 Cal.App.4th at p. 925) of evidence that any of the factors on which the Board relied in denying parole in this case support a conclusion that Rodriguez would pose a risk to public safety if released on parole, I dissent.

AARON, J.

7